UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>– v –<br><br>GILBERT ARMENTA,<br><br>            Defendant. | 17-CR-556 (ER) |

**SENTENCING MEMORANDUM ON BEHALF OF GILBERT ARMENTA**

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000

*Attorneys for Defendant Gilbert Armenta*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. i

PRELIMINARY STATEMENT ..................................................................................... 1

PERSONAL AND PROCEDURAL HISTORY ........................................................... 5

I.    Gilbert Armenta's Personal History ................................................................. 5
      A.    Early Years .................................................................................................. 5
      B.    Addiction ...................................................................................................... 6
      C.    Professional History ................................................................................ 7
      D.    Gilbert's Family ........................................................................................ 8
      E.    Time at the MCC ....................................................................................... 9

II.   Gilbert's Family and Friends Attest to His Many Wonderful Qualities ............ 15
      A.    Gilbert's Mother and Siblings ................................................................. 15
      B.    Gilbert's Wife and Children ..................................................................... 16
      C.    Gilbert's Friends and the Broader Community ....................................... 18

III.  Offense Conduct and Case History ................................................................ 21
      A.    The Offense Conduct ............................................................................... 22
            1.    The OneCoin Scheme ................................................................... 22
            2.    The Bribes to Officials in Mexico ............................................... 25
            3.    Illegal U.S. Gambling Proceeds .................................................. 25
      B.    Gilbert's Cooperation with the Government ........................................... 25
            1.    Gilbert's Cooperation Was Immediate and Impactful ................ 26
            2.    Gilbert's Cooperation Put Him and His Family at Risk ............. 28
            3.    Gilbert's Historical and Proactive Cooperation Was Extensive ............. 32
            4.    Gilbert's Cooperation Resulted In Tremendous Benefits to Law
                  Enforcement ................................................................................. 33
            5.    Gilbert's Cooperation Continued Even after His Remand ........ 35
            6.    The Ongoing Emotional, Physical, and Financial Strain from Gilbert's
                  Cooperation ................................................................................. 37
            7.    The Sale of The Airplane ............................................................ 39
            8.    The Kawase Check ....................................................................... 41
            9.    Consequences of Gilbert's Actions ............................................. 43

LEGAL ANALYSIS ...................................................................................................... 44

IV.   The Advisory Sentencing Guidelines Calculation ......................................... 44
      A.    A Substantial Downward Variance Is Warranted Based on the Loss Calculation 45
      B.    A 6-level Enhancement under Section 2B1.1(b)(2)(C) Is Unwarranted .............. 46
      C.    Section 2B1.1(b)(10) Does Not Apply ..................................................... 47
      D.    A Manager or Supervisor Enhancement Is Inappropriate ...................... 49
      E.    The Total Offense Level and Corresponding Sentencing Range ........... 50

V.      The § 3553(a) Factors Call for a Non-Guidelines Sentence ............................... 50
        A.      Gilbert's Acceptance of Responsibility and Substantial Cooperation ................. 51
        B.      Gilbert's Personal Characteristics Warrant Leniency ........................................... 56
        C.      The Need for Just Punishment and Adequate Deterrence Has Been Satisfied ..... 58

VI.     The Government Has Not Established an Adequate Basis for Restitution ....................... 64
        A.      Restitution ............................................................................................................. 64
        B.      Forfeiture ............................................................................................................... 66

CONCLUSION .......................................................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Koon v. United States*, 518 U.S. 81 (1996) ...................................................................51

*Pepper v. United States*, 131 S.Ct. 1229 (1996) ...........................................................51

*Rita v. United States*, 51 U.S. 338 (2007) ...............................................................51, 52

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR) ...............45, 46, 56, 58, 63

*United States v. Adorno*, 950 F. Supp. 2d 426 (E.D.N.Y. 2013) ...................................67

*United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991) .....................................................48

*United States v. Baron*, 18 CR 00102 (KAM) (E.D.N.Y. Jan. 24, 2019) ......................65

*United States v. Batista*, No. 18 Cr. 319 (LTS), 2022 WL 1997173 (S.D.N.Y. June 6, 2022) ........................................................................................................62

*United States v. Beckford*, No. 05 Cr. 944 (RWS), 2006 WL 1390414 (S.D.N.Y. May 17, 2006) ........................................................................................................50

*United States v. Burgos*, 324 F.3d 88 (2d Cir. 2003) ....................................................50

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ..................................................65

*United States v. Catoggio*, 326 F.3d 323 (2d Cir. 2003) ...............................................66

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ..................................................51

*United States v. Collins*, 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013) (ECF No. 244) ...........................................................................................................57

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ..................................................46

*United States v. Ferguson*, 584 F. Supp. 2d. 447 (D. Conn. 2008) ..............................46

*United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) (VLB) ...............................60

*United States v. Hamilton*, [2022] ...............................................................................35

*United States* v. *Holguin*, 436 F.3d 111 (2d Cir. 2006) ...............................................49

*United States v. Howe*, 16 CR 00632 (VEC) (S.D.N.Y. Apr. 5, 2019) (ECF No. 86) .............................................................................................................55

*United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ........................................................................................................45

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ....................................................51

*United States v. Kent*, 821 F.3d 362 (2d Cir. 2016)........................................................49

*United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. May 11, 2018) (ECF No. 791) ......................57

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)....................................................46

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ...................................................64

*United States v. Silkowski*, 32 F.3d 682 (2d Cir. 1994) .....................................................66

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...................................................51

*United States v. Turner*, 624 F. Supp. 2d 206 (E.D.N.Y. 2009) ....................................................48

*United States v. Williams*, 16 CR 436 (KMW) (S.D.N.Y. Dec. 18, 2018) (ECF No. 306) ......................................................................................................54

*United States v. Yeaman*, 248 F.3d 223 (3d Cir. 2001) .....................................................64

*United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012) ...................................................66

*USA v. Armenta*, No. 17-CR-556 (ER) (S.D.N.Y. Mar. 20, 2020)................................................67

**Statutes and Rules**

18 U.S.C. 1956..........................................................................................................50

18 U.S.C. § 3553(a) .............................................................................................46, 51, 52

18 U.S.C. § 3624(c)(1)..............................................................................................63

18 U.S.C. § 3663A(a)(1)..............................................................................................65

18 U.S.C. § 3663A(a)(2)..............................................................................................65

18 U.S.C. § 3663A(c)(1)(B)..............................................................................................65

18 U.S.C. § 3663A(c)(3)(B)..............................................................................................66

18 U.S.C. § 3664(e) ..............................................................................................66

34 U.S.C. § 60541 ..............................................................................................63

Title 11, United States Code ..............................................................................................47

Gilbert under the Mandatory Victims Restitution Act of 1996 .....................................65

Misc 1.............................................................................................................................35

MVRA.......................................................................................................................65, 66

U.S.S.G. § 2B1.1...................................................................................................45, 47

U.S.S.G. § 2S1.1...............................................................................................................44

U.S.S.G. § 5K1.1 ..................................................14, 15, 25, 26, 35, 39, 53, 56

USSG § 5E1.1(b)(2)..................................................................................................66, 67

**Legislative and Administrative Proceedings**

45 Op. O.L.C. __, 2021 WL 6145876 (Dec. 21, 2021) ...........................................62, 63

Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*
(Mar. 13, 2020) .......................................................................................................14

**Treatises and Periodical Materials**

Alexander Nazaryan, *Manhattan Jail Where Jeffrey Epstein Died Has Long
History of Suicide, Neglect*, Yahoo News (Aug. 14, 2019) .....................................10

Stephen Rex Brown, *Contraband Video Gives Rare Look at "Disgusting"
Conditions Inside Manhattan Federal Jail*, New York Daily News (Apr. 27,
2020) .......................................................................................................................10

*Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates
Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News, Mar. 6, 2020 .............13

**Military Rule**

Aviva Stahl, *Prisoners Endure A Nightmare "Gulag" in Lower Manhattan,
Hidden In Plain Sight*...............................................................................................10

Aviva Stahl, "*Toilet Waste and Feces Were All Over the Floors*" ................................10

"Discretion to Continue the Home-Confinement Placements of Federal Prisoners
After the COVID-19 Emergency" (the "OLC Opinion").......................................62

https://americanaddictioncenters.org/rehab-guide/success-rates-and-statistics..............................7

Keegan Hamilton, *New York Jail that Held El Chapo and Jeffrey Epstein Now
Has a Coronavirus Case*...........................................................................................14

*Normal Operations After Smuggled Gun Triggers Lockdown*, NBC New York,
   Mar. 11, 2020, *at* https://bit.ly/3aeTGwA..............................................................13

## PRELIMINARY STATEMENT

More than five years ago, Gilbert Armenta was arrested at the airport upon his return from a business trip to Europe.  Federal agents informed him that he was arrested for extortion of an individual in the United Kingdom.

From the moment Mr. Armenta was taken into custody in September 2017, he cooperated with law enforcement regarding not only the alleged extortion, but also regarding his involvement with the founder of the cryptocurrency company OneCoin, who herself is now on the FBI's Ten Most Wanted Fugitives List.  The OneCoin investigation was in its early stages and lacking any witnesses.  Mr. Armenta proceeded to provide the government with that evidence through an extraordinary 14 straight days of proffer sessions, which included weekends and days during which the investigating agents lived with Mr. Armenta in a hotel room.  Among other things, Mr. Armenta immediately provided the investigators with access to his email accounts, and permitted the investigating agents to conduct a consent search of his business office at night to avoid any leak of the investigation.  At the time of his guilty plea several months later, the supervising prosecutors characterized Mr. Armenta's ongoing cooperation efforts as "extraordinary."  Those efforts resulted in the indictment of both co-founders of OneCoin (including the original CEO), and the subsequent CEO as well, among others.

The results of Mr. Armenta's cooperation are nothing short of astounding.  As a direct or indirect result of his cooperation, at least *14* additional defendants were indicted, including the architect of the OneCoin fraud and her heir apparent, her brother.  ***Eight*** defendants have been convicted following Mr. Armenta's invaluable cooperation and assistance and leads generated from that assistance.  In addition, Mr. Armenta has forfeited more than ***$40 million*** to the

Department of Justice in his effort to make amends for his crimes, and in addition has agreed to forfeit the proceeds from two properties each worth millions of dollars.

Mr. Armenta's cooperation put himself and his family at great risk, and the attendant safety and security concerns placed an added crippling strain on his marriage.  For more than two years, he was repeatedly debriefed by prosecutors, engaged in dozens of recorded phone calls and in-person meetings in order to obtain evidence the Government could use to build cases against others, some of whom were connected with OneCoin, and others who were not.  Mr. Armenta's cooperation directly led to the indictment of the kingpin of the OneCoin enterprise, Ruja Ignatova.  At the Government's request, he conducted approximately 44 tape recorded phone calls with Ignatova, totaling more than 30 hours of discussions with her.  During the course of his cooperation it was discovered that Ignatova had bugged Mr. Armenta's apartment prior to his arrest, giving her information about his cooperation status and putting his family in harm's way.  The safety threat was confirmed in the Government's subsequent cooperation agreement with Ignatova's brother (Konstantin), who was arrested based upon Mr. Armenta's cooperation and ultimately cooperated with the Government as well.  ███████████████

████████████████████████████████████████████

███████████████

In 2019, Mr. Armenta was remanded to the MCC for eight months.  Notwithstanding his remand, and the Government's clear indication that it would no longer treat Mr. Armenta as a cooperating witness, Mr. Armenta continued his efforts to cooperate with the Government, including providing information and waiving attorney-client privilege on documents relevant to the October 2019 trial of Mark Scott.

Mr. Armenta faced inhumane conditions at the Metropolitan Correctional Center ("MCC"), including rat and cockroach infestations, constant threats of violence, and rampant inmate drug use, which was particularly trying for him, as a 35-year clean former addict.  Mr. Armenta ████████████████████████████████████ ████████████████████████████████████  Conditions at the MCC were so deplorable that the Government shut the facility down in 2021, a remarkable concession by the Government that the facility was uninhabitable even for inmates.  As with other defendants who experienced the deplorable MCC conditions, any sentence imposed here should reflect the incrementally punitive nature of that period of incarceration.  *See, e.g., United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 16, 2021) (ECF 250 at 17:22—18:2) ("I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served.  So I think having served 24 months is equivalent to having served three years.").

Mr. Armenta faced not only the awful daily conditions of the MCC, ████████████ ████████████████████████████████████ ████████████████████████████████████ Making matters even worse during his incarceration, inmates were locked down repeatedly due to the high-profile death of Jeffrey Epstein inside the facility as well as the unrelated loss of a guard's firearm.  Then, COVID-19 spread in the MCC, and Mr. Armenta contracted the virus.  Over government objections, Your Honor released Mr. Armenta from the MCC and placed him on home confinement, where he ultimately recovered from most of his COVID-19 symptoms.

Mr. Armenta was and remains very grateful that the Court released him.  From his release in late March 2020 through July 14, 2022, Mr. Armenta was on home confinement with severe restrictions on his ability to leave his apartment.  On July 14, 2022, the Court modified Mr. Armenta's home confinement conditions to permit him four hours outside of his residence six days per week.  Otherwise, his strict conditions of home confinement remain.  The most significant (but far from the only) adverse impact from the home confinement period has been Mr. Armenta's inability to visit and care for his aging and ailing mother.  As noted in more detail below, various friends and family attest to Mr. Armenta's devotion to his mother, and it has been particularly difficult for him not to be there for his mother for the past three-plus years during which her health has deteriorated.

Mr. Armenta's conduct was admittedly serious.  However, the Court should take into account that Mr. Armenta was not an employee or executive of OneCoin.  He did not develop, design, solicit investments into, or otherwise make any representations to the victims of the underlying OneCoin fraud scheme.  In light of that and the results and circumstances of Mr. Armenta's immediate and sustained cooperation with law enforcement, the significant period of incarceration already served under deplorable conditions, the lengthy period of home confinement since his release, and the fact that his incarceration directly caused his contracting COVID-19 and another medical condition ████████████████ Mr. Armenta respectfully requests that the Court sentence him to time served.

## PERSONAL AND PROCEDURAL HISTORY

**I.**     **Gilbert Armenta's Personal History**

    **A.**     **Early Years**

Mr. Armenta has overcome drug addiction, turned business failure into success, ushered family and friends alike through many difficult times with acts of love, kindness and leadership, and raised two wonderful sons.

Mr. Armenta, 59 years old, was raised in Madera, California in the San Joaquin Valley. He is the middle of three children. His older brother Charles Jr. ("Charlie") and his younger sister Cecelia ("Cissy") both attest to how critical Gilbert is to their family unit, and how, for Gilbert, family always comes first. Gilbert's parents were married for over fifty years until his father passed away from ████████ in 2016. His father Charles Armenta was a fierce disciplinarian ████████████████████ throughout Gilbert's childhood and early adult years. ██████████████████████████████████████ ████ However, Charles also instilled a strong work ethic in his sons. When Gilbert was just 11 years old, he and his brother began working on farms in Fresno, California every summer, picking grapes in 100-degree heat to earn modest wages they used to buy their own clothing. Charles came from a family of farm workers in Mexico, and he wanted his sons to understand the value of a dollar and a hard day's work. Gilbert and his brother dutifully complied with their mandate as grape-pickers until Gilbert started high school and was able to convince his father to let him bag groceries at a local grocery store instead. In the words of Charlie, "my brother

Gilbert has an incredible mind, but his work ethic is without equal."  Charlie Armenta Video, Ex.

A.[1]

Gilbert went on to Fresno City College, where he majored in civil engineering between

1982 and 1984.  At that point, he dropped out of college because he had developed a drug

addiction that impaired his ability to continue his education.

### B.    Addiction

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████  Gilbert also suffered

from drug and alcohol addiction, but he turned his life around and has now been sober for 35

years.

Gilbert started drinking when he was 18 or 19 years old.  He began using cocaine around

the same time.  Between the ages of 19 and 22, he snorted cocaine every day after work.  He then

progressed to snorting cocaine throughout the day, using one-half of a gram to a gram of cocaine

every day.  Gilbert's life deteriorated—he lost his job, lost his driver's license, stopped speaking

to his father, and jeopardized his relationships.  He completed a six-to-eight week outpatient

treatment program in California, but continued to use cocaine during that time.  Finally, out of

desperation, his parents implored him to attend an inpatient treatment program at Maynord's

Recovery Center in California when he was 24 years old.  Upon release from the program,

Gilbert used crystal meth one time before deciding that he was done with drugs forever.  He

spent several years attending Narcotics Anonymous and Alcoholics Anonymous meetings, and

---

[1]    The video exhibits submitted in support of this sentencing memo were prepared in advance of a much earlier
       sentencing date while Gilbert was still incarcerated in the MCC.

he has not used drugs or alcohol in 35 years.  His resolve was tested daily during his time at the

MCC, where he was constantly surrounded by drugs, but he did not break down.  The therapeutic

community claims a 30 percent success rate of addiction rehabilitation, even when only

accounting for people who complete their treatment programs and excluding the other 70 to 80

percent who drop out of their programs.[2]  Gilbert's success in maintaining his sobriety for 35

years is indicative of his extraordinary ability to reform.

### C.    Professional History

Gilbert began what ultimately turned into a successful career in the technology sector by

installing and servicing stereos, two-way radios, and mobile phones, and eventually opened his

own electronics store.  In 1993, he took a job as an Implementation Supervisor with GTE

Mobilenet, which eventually merged with Bell Atlantic to become Verizon, where he was

responsible for managing implementation of cellular and microwave networks, including

engineering requirements, zoning regulations, etc.  In 1995, Gilbert took a similar position

implementing networks at Sprint PCS Group.  In 1998, he moved to Crown Castle International

Corporation as the Vice President of System Development and Business Development, where he

developed a plan to revamp their global wireless communications and broadcast infrastructure,

and worked to secure contracts with major telecommunication providers.

In 2001, Gilbert founded his own company called Mio Group, which had approximately

50 employees.  Mio Group developed a multi-island network in the Caribbean that provided

wireless, video-on-demand, gaming, and hospitality products to nearly 8.5 million subscribers.

However, the company collapsed in the 2009 financial crisis.

---

2.  American Addiction Centers, *Rehab Success Rates and Statistics* (Jan. 31, 2020), *at*
    https://americanaddictioncenters.org/rehab-guide/success-rates-and-statistics.

Between 2009 and 2013, Gilbert consulted for outside wireless ventures and focused on restructuring his personal finances.  He filed for Chapter 7 bankruptcy in March 2013, which was discharged in June 2014 and resulted in financial ruin for Gilbert.  To remain employable, Gilbert educated himself on the payment processing sector.

In 2013, Gilbert founded entities to provide card issuing and payment processing services.  Gilbert's companies offered prepaid cards that could be used for various purposes, including business expenses, payroll, direct deposit, and loyalty programs.  His companies also offered payment processing services—for example, he could help an online merchant utilize the banking relationships, card processors, and payment networks necessary to transform a customer's mouse-click into a corresponding deposit of funds into the merchant's accounts.

### D.      Gilbert's Family

Gilbert's arrest, cooperation, and subsequent remand and home confinement have taken a severe toll on his family life.  Gilbert married Basia Armenta in 2006 and the two had been very close even through Gilbert's arrest and remand.  Indeed, they spoke every day while he was at the MCC and she traveled from Florida to New York every week to visit him, except during the numerous lockdowns and when she was in Poland visiting her mother.  However, the stress of prolonged cooperation, ongoing safety concerns about retribution from Ms. Ignatova and the five years since Gilbert's arrest finally took its toll on the relationship, as Gilbert and Basia separated within the past year.  Notwithstanding the separation, Basia remains supportive of Gilbert.

Gilbert has two sons through a prior marriage – Gilbert Estephen Armenta Jr., who goes by Estephen, is 29 years old, and Oliver Armenta is 21 years old.  He is very close with both, although Gilbert's incarceration put a significant strain on his relationship with his younger son.

At the time of his prior divorce, Gilbert's family was living in Arizona, so he moved into a house nearby.  About a year later, Darlene, his ex-wife, moved to California with the boys.  For the next ten years, Gilbert traveled to California from wherever he was every two weeks to spend time with his sons. ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

        ████████████████████████████████████████████████

████████████████████████████  Gilbert threatened legal action unless Darlene sent Oliver to live with him in Florida.  The move caused stress in his existing marriage, ████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████  Ultimately, the family remained very close and Oliver went on to graduate from high school in Ft. Lauderdale.  During Gilbert's incarceration, however, ████████████████████████████████████

████████████████████.  Gilbert tried to help his son remotely from the MCC, but Gilbert's incarceration upset Oliver and they stopped speaking between December 2019 and March 2020.  Although the two reconnected after Gilbert left the MCC, the strain on the relationship remains.

### E.    Time at the MCC

While incarceration is unpleasant for any inmate, Gilbert Armenta by all accounts had a particularly difficult experience.  Because Gilbert pled guilty to his charges, but had not yet been sentenced at the time of his remand, he was sent to the MCC, over 1,200 miles away from his

family.  The MCC was widely considered to be one of the worst jails in the country under even the best of circumstances.[3]

Gilbert entered the MCC on July 19, 2019 and spent the first 7 days in solitary confinement in the Special Housing Unit ("SHU").  The SHU is normally reserved for inmates considered to be a danger to themselves or others, but in Gilbert's case, he was held in the SHU because the Bureau of Prisons (the "BOP") had failed to determine where he could be housed

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████  Unlike general population inmates, Gilbert was not allowed access to email, telephones, or non-legal visitors.  Further, because there were only two attorney rooms available to SHU inmates, and because Jeffery Epstein's attorneys were monopolizing those rooms at the time, Gilbert could not even meet with his attorneys for the first week of his incarceration.  Then, as his eventual first visit with his attorneys concluded, Gilbert stood by the windowed door of the visitation room, awaiting a guard to retrieve him.  ████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

3.  *See, e.g.*, Stephen Rex Brown, *Contraband Video Gives Rare Look at "Disgusting" Conditions Inside Manhattan Federal Jail*, New York Daily News (Apr. 27, 2020), *at* https://bit.ly/2SbIjjW; Alexander Nazaryan, *Manhattan Jail Where Jeffrey Epstein Died Has Long History of Suicide, Neglect*, Yahoo News (Aug. 14, 2019), *at* https://yhoo.it/3cpdNcS; Aviva Stahl, "*Toilet Waste and Feces Were All Over the Floors": Federal Jail Where Epstein Died is Still a "Dangerous" Place*, Gothamist (Aug. 13, 2019), *at* https://bit.ly/2KcKdv6; Aviva Stahl, *Prisoners Endure A Nightmare "Gulag" in Lower Manhattan, Hidden In Plain Sight*, Gothamist (June 19, 2018), *at* https://bit.ly/2XDYcCh.

██████████████████████████████████████████ As Ignatov's own subsequent plea

agreement and testimony demonstrate (*see* Section III.b.2, below), Gilbert's fear of reprisal was

legitimate.

Shortly after entering the general population, ████████████████████████████

████████████████. He was advised to send an email requesting medical attention, which

he did that day. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

Life in prison is not meant to be easy, but the MCC failed to meet even basic standards of

care, health, and safety.  The facility was badly infested with cockroaches and rodents, which

Gilbert's attorneys heard running through the walls of the attorney meeting rooms during every

legal visit throughout his incarceration.  Gilbert frequently noted that his commissary food,

toiletries, clothing, and books had been gnawed to bits.  He would wake up several times

throughout the night to chase rodents out of his locker and to clear out any feces that had been

left behind.  Requests for rodent and cockroach traps went ignored.

Although the MCC has no yard for outdoor activity, it does have a rooftop that inmates are supposed to have access to at least once a week.  Notwithstanding an exemplary prison disciplinary record, Gilbert was allowed to access the rooftop only one time during his entire 253-day stay.  One of the tiers Gilbert lived on had no hot water for months, so he was forced to either take freezing showers or to barter his possessions with inmates on other tiers so that they would allow him to use their showers.

Perhaps the most difficult part for Gilbert was the rampant drug use that surrounded him. Gilbert has maintained his sobriety for 35 years in part by ensuring that he is never around people who are using drugs of any kind.  Gilbert saw many addicts begin using again at the MCC because drugs were so easily accessible and to dull the inhumane treatment and traumatic experiences they endured in jail.  For all but the last 60 days of his incarceration and the first week in the SHU, Gilbert shared a small cell with various roommates who abused drugs on a daily basis.  In addition to testing Gilbert's own sobriety, which inevitably strained his relationships with his cellmates, living with drug users also created a tense environment because they faced frequent threats and violence due to delays in payment or the inability to pay at all for their drugs.  The tension only heightened for Gilbert if one of his addict cellmates could not access drugs for some period of time and thus became increasingly hostile toward him.  As a testament to his inner strength, Gilbert was able to survive incarceration with his sobriety intact.

Conditions worsened any time that the MCC went into lockdown, which was an unusually frequent occurrence during Gilbert's incarceration.  Of the 253 days that he spent at the MCC, he spent at least 53 of them (over 20%) in either lockdown or the SHU, not a single day of which was due to any disciplinary issue of his own.  Most of the lockdowns lasted between one and five days, during which inmates were kept in their cells 24 hours a day except

12

during meals, bathroom trips, and attorney visits.  Inmates were not allowed to use the telephones, computers, common areas, outdoor rooftop area, or to receive social visitors.  During Gilbert's incarceration, lockdowns resulted from Jeffrey Epstein's death, discovery of contraband or weapons, rape, stabbings, and a boiling water attack.

Then, from February 27, 2020 to March 11, 2020, the MCC entered its worst lockdown yet while law enforcement searched for a loaded gun brought into the facility by a correctional officer.[4]  During this lockdown, MCC personnel were replaced by a Special Operations Response Team ("SORT") sent from Arizona by the Bureau of Prisons.  Inmates were subject to multiple raids in the middle of the night, during which they were ordered to back out of their cells and sit on the floor with their hands raised above their head for hours at a time.

The SORT members destroyed cells in their search for the gun, and Gilbert spent days with nothing but the clothes on his back.  He had no clean underwear or clothing, no blankets, and no toiletries.  Most of his personal possessions were never returned to him.  He was not allowed to shower during this two-week period.  Inmates reported to attorneys that mice and water bugs ran through the units as guards unblocked holes in walls and vents that inmates had stuffed with clothing to prevent pests.  Toilets overflowed, spreading raw sewage.  No clean drinking water was provided; inmates were forced to drink from their bathroom sinks, from which brown water often ran.

---

4.   *See* Stephen Rex Brown, *Strip Searches, Frozen Bologna Sandwiches and Wrecked Cells: MCC Inmates Detail Lockdown Due to Smuggled Gun*, N.Y. Daily News, Mar. 6, 2020, *at* https://bit.ly/2xqbgjw; Jonathan Dienst, *MCC Returns to Normal Operations After Smuggled Gun Triggers Lockdown*, NBC New York, Mar. 11, 2020, *at* https://bit.ly/3aeTGwA.

Any potential reprieve following the lockdown was short-lived.  On March 13, 2020, the BOP issued an order suspending all visits due to the COVID-19 pandemic.[5]  This was an especially terrifying time for Gilbert, as his age and history of respiratory problems made him particularly vulnerable to COVID-19.  Despite a constant state of lockdown, high-risk inmates like Gilbert were inexplicably removed from two-man cells and placed into a group cell for high-risk inmates, in which 26 men had to share one shower and one toilet.  It was impossible to maintain proper hygiene or social distancing in the group cell.  By March 17, 2020, several inmates in Gilbert's high-risk unit were coughing and feverish, but received no medical care other than Ibuprofen.  On March 23, 2020, the first MCC inmate was diagnosed with COVID-19—one of the at-risk inmates from Gilbert's unit.[6]  Thankfully, on March 25, 2020, over the Government's objection, this Court granted Gilbert temporary home detention in light of the pandemic.  Again, his reprieve was short-lived as he had contracted the virus at MCC prior to his release.  Gilbert experienced COVID-19 symptoms within 24 hours of his release, and was eventually tested and subsequently received a positive diagnosis.  From COVID, Gilbert lost his senses of smell and taste, neither of which has returned fully since.

At the time of Gilbert's remand in July 2019, the Government represented that while it had not yet made a final decision on whether he would receive a Section 5K1.1 letter, it was highly doubtful.  In spite of the uncertainty and the strong signal from the Government that it would no longer provide a 5K1.1 letter, Gilbert continued aiding the Government in any way he

---

5.  Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan* (Mar. 13, 2020), *at* https://bit.ly/2XE1421.

6.  Keegan Hamilton, *New York Jail that Held El Chapo and Jeffrey Epstein Now Has a Coronavirus Case*, Vice (Mar. 23, 2020), *at* https://bit.ly/2VvIruC.

could; he attended two proffer sessions post-remand, ensured that his employees provided his attorneys financial documents to aid the Government's case while he was in jail, and waived privilege on broad swaths of emails so that the Government could use those emails in its case against Mark Scott.  It was not until December 2, 2019, after the jury returned a guilty verdict in the Scott trial, that the Government formally informed Gilbert that it would not provide a 5K1.1 letter.

## II.      Gilbert's Family and Friends Attest to His Many Wonderful Qualities

### A.      Gilbert's Mother and Siblings

Gilbert's mother and siblings know him as a selfless caregiver for the entire family with a spirit of generosity that knows no bounds.  Gilbert's brother, Charlie, describes him as "very giving, a very loving man.  He gives everything he has to his family and he takes care of his friends."  Charlie Armenta Video, Ex. A.

Prior to his incarceration at MCC, Gilbert spoke to his 81-year-old mother, Virginia, every day.  She lives alone in Fresno, California and is in poor health ███████████████.  More recently, she has suffered from ████████████████████████████████████████████████████████████████████████████████████████████████████  ████ Gilbert financially supports his mother, including paying for a home health aide to manage her conditions.  Virginia attests that prior to Gilbert's incarceration, Gilbert had "always been there for me."  Virginia found the eight months that Gilbert was at MCC "unbearable."  Virginia Armenta Video, Ex. B.  Her physical and emotional health suffered, ████████████████  ████████████████████████  *Id*.  From the perspective of caring for his mother, Gilbert's home confinement has been as severe as his incarceration in the MCC, as it has limited his ability to be there for her as she is unable to travel.

Gilbert's brother Charlie ███████████████████████████████████████

███████████████, and Gilbert always steps in to help Charlie and his family navigate those

periods.  Charlie explains, "Gilbert has always been beside me to support me emotionally and in

many ways he would make sure I was comfortable and make sure I had money to eat and just

took care of me.  He took really good care of me at those times, those really dark times."  Charlie

Armenta Video, Ex. A.

Charlie shares one specific incident that happened in 1989 when he was about to start

culinary school.  Charlie Armenta Video, Ex. A.  Charlie ████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ so Gilbert traveled hundreds of miles to pick him up.  *Id.*  Gilbert had removed

all of the tools and equipment from the back of the van he used for his electronics business, and

had put a mattress in the van instead.  *Id.* ████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ *Id.*  Charlie says, "my brother has gone to every length to help me, but he's also

done so many things for other people . . . he's got a great character."  *Id.*

### B.     Gilbert's Wife and Children

Gilbert's wife, Basia, describes him as "the center of our family and his absence would

be devastating to all of us, especially his children as they need him to guide them to finish their

education."  Basia Armenta Video, Ex. C.  "He has always been nothing but a very supportive,

kind, respectful, and caring husband.  He's a fantastic father to his two sons, and a caring,

devoted son to his and my parents."  *Id.*  Basia echoes others in emphasizing Gilbert's well-

known spirit of generosity, explaining, "He's a giver and cares about society in a way that only

few people do", and teaches his sons that everyone is to be treated with kindness and respect no matter their background.  *Id*.

Gilbert's son, Estephen, also describes him as the "core" of the family, and views his father as "one of the most kind and generous and supportive people that I've ever met in my life. I know that he cares more about other people than he does himself and anything he does is out of compassion and out of concern for other people.  He always is putting other people before himself."  Estephen Armenta Video, Ex. D.  Gilbert cares for all of his family members without expecting anything in return—whether it's his brother █████████████████████████ ████████, his mother ██████████████████████████████, or his mother-in-law in Poland who needs some extra help.  *Id*.  Estephen says that, "Everybody [Gilbert] has a relationship with he has a very close relationship with, and he likes to keep the people he cares about close to him so that they can reach out to him when they need him.  This goes beyond just his family to the people who work for him, who would tell you that he is nothing if not understanding and supportive."  *Id*.  As an example of Gilbert's boundless support, when Estephen expressed a passion for music, Gilbert urged him to follow that passion as far as he could, and helped Estephen to brainstorm ways to work music into a career.  *Id*.  Although Estephen and Gilbert were not very close when Estephen was a child since he lived in another state with his mother, they have become incredibly close over the past seven or eight years and now share everything with each other.  *Id*.

Gilbert's younger son, Oliver, describes his father as a "shining light" in his life.  Oliver Armenta Video, Ex. E.  He too has fond memories of his father encouraging his passion for music—buying him his first guitar at 14 years old and telling him to just run with it.  *Id.*  Oliver's strongest memory is of his father's determination to support Oliver during his rocky transition

into living in Florida when he was 12 years old.  *Id*.  "No matter what happened, no matter what I said to him or how mean I was, he was so persistent in showing me that he loved me . . . He would just always find a way to show that he cared and that he was there."  *Id*.

Gilbert's love and support extends beyond just his immediate family.  Among others, he has supported his cousin's family as they have coped with the tragic accident ███████████ ████████████████████████.  Serena Trujillo Letter, Ex. G.

C.      **Gilbert's Friends and the Broader Community**

Gilbert's friends and employees express similar sentiments about his character and the ways in which he has gone out of his way to improve lives.  Frank McBee, a family friend who has known Gilbert for 30 years and worked with his father at the BNSF Railway explains, "Over the years I have seen Gilbert go the extra mile for many of his family members.  He has always been especially respectful and protective of his parents, which I find so refreshing in this day and age."  Frank McBee Letter, Ex. H.  Peter Mcloughlin, Gilbert's brother-in-law adds, "As an employer [Gilbert] is extremely supportive and caring of his employees . . . some employees worked with him for many years, which is a testimony to his positive and nurturing management approach."  Peter Mcloughlin Letter, Ex. I.  One employee describes Gilbert's approach even in tough times as follows: "Every day is full of energy and inspiration to all of us around.  There is no giving up, slowing down or having a bad day.  There is always inspiration and motivation to be the best we can."  Ewa Perez Letter, Ex. J.  Likewise, Van Tran, a 79-year-old who immigrated to the United States and who, due to personal circumstance "kn[ew] how to feel humiliated, to be scared, to have no hope and no purpose[,]" described Gilbert as "truly a softhearted compassionate person."  Van T. Tran Letter, Ex. K.

18

One more recent colleague and friend demonstrates that Gilbert not only is an inspiration to others, but has truly accepted responsibility for his actions and is sincerely remorseful. Audrey Smith explains that when she first met Gilbert two years ago, he fully explained to her his criminal charges, "with no detail spared. I heard the good, the bad, and the ugly. His sincerity and ability to hold himself accountable was nothing short of humbling. . . He's discussed his remorse for some poor decisions and from my vantage point, he works diligently to try to rebuild relationships that may have been damaged from this matter." Audrey Smith Letter, Ex. L. She goes on to say that "the Gilbert that I know, is generous to a fault. If he can help someone, he will. He is the most giving person I know with his time, resources, and knowledge."

Giselle Valentin, Gilbert's employee of six years, describes the way her life did a "complete 180 change for the better" after he took a chance on her despite her lack of qualifications and college education. Giselle Valentin Letter, Ex. M. She explains, "Through his gracious generosity and vision, he has changed the lives of so many families just by elevating one person at a time. Believing in people and encouraging them to step out of their comfort zone thus making it possible to achieve true happiness and financial freedom. Things that are so hard to come by in society if you are not educated or well connected." *Id*. Gilbert similarly inspired others to advance their education in order to better their futures, through both emotional and financial support. One grateful recipient attests that Gilbert encouraged her to obtain a law degree, provided assistance with tuition, and ultimately helped her obtain employment, while he "has never asked for anything in return." Ekaterina Yamaeva Letter, Ex. N. Another reports that during a period of financial hardship, Gilbert helped her establish a financial plan that allowed her to keep her home and a car for much needed transportation. Michelle Austin Letter,

Ex. O.  Basia Armenta also relates a story where Gilbert funded the college education of a family friend's child who was an honor's student and otherwise would not have been able to afford to remain in college.  Basia Armenta Video, Ex. C.

Gilbert continued to demonstrate his passion for fostering others throughout his difficult time at the MCC.  During the months that he was there, he tutored four other inmates to help them prepare for their GED exams.  Many of Gilbert's fellow inmates were at the MCC for drug dealing, and he realized that some of them had unknowingly acquired project management skills in the process.  Gilbert has always believed in project management training, and he requires most of his employees to receive certification from the Project Management Institute.  He also knew that many project management positions do not require college degrees, so a GED would be sufficient to be hired.  He approached the teacher of the MCC GED program about creating a curriculum for a project management course that would build inmates' skill sets and help them to pursue lawful employment opportunities upon release.  Gilbert also purchased project management textbooks and gifted them to the MCC library.  At the time Gilbert left the MCC, he and the GED teacher had just finished finalizing their curriculum to launch the program.

Gilbert continues to find ways to better society through employment of those with conviction records as well as military veterans.  One such effort is described by Tim Connell, the CEO of Hart Dairy Creamery, a large grass-fed dairy company and supplier to the U.S. government.  Encouraged by Gilbert's request to employ veterans at the Creamery, Mr. Connell notes that his company adopted an initiative to hire and employ veterans as 7 percent of his workforce, an effort which "never would have happened without Gilbert's direction."  Tim Connell Letter, Ex. P.  His colleague Audrey Smith hit the nail on the head: "I have no doubt that if given the opportunity to rejoin society, Gilbert would find a way to enrich the lives of the less

20

fortunate, and those struggling with addiction.  It's Gilbert's mission to bring humanity to others in a large-scale manner, whether through food programs, or providing education and technology to the disenfranchised."  Smith Letter, Ex. L.

Gilbert's penchant for helping those in need is not a post-arrest phenomenon.  Prior to his incarceration, Gilbert was heavily involved in charitable work.  He started a foundation called Casa Armenta, which provides financial assistance to young people in need of support.  For example, through Casa Armenta, Gilbert sent an employee's son named ███████████ to rehab, and paid for the medical care, travel expenses, and wheelchair of Diego Trujillo when he was shot twice while riding his bicycle in Visalia, California.  Angel Pacheco Letter, Ex. Q; Cissy Mcloughlin Video, Ex. F.  Gilbert has provided ongoing support to an organization called H.O.M.E.S., which provides shelter and education to children who age out of the foster care system, and which counts one of Gilbert's employees as a board member.  In fact, Gilbert has strongly encouraged his employees to dedicate time to this organization, and as a result of which they have enthusiastically volunteered their time and effort.  Gilbert also has generously supported other charitable organizations over the years, including the Make-a-Wish Foundation and the Anthony Robbins Foundation.

## III.   Offense Conduct and Case History

The criminal conduct in which Gilbert Armenta participated falls into three categories: (i) the OneCoin cryptocurrency fraud scheme; (ii) bribes paid in connection with a government contract in Mexico; and (iii) internet gambling proceeds.  ██████████████████████ ████████████████  On January 24, 2018, Gilbert pled guilty to five charges in connection with this conduct, pursuant to a cooperation agreement.

21

A.      **The Offense Conduct**

At the time of Gilbert's arrest, the OneCoin cryptocurrency scheme was the only conduct on the Government's radar screen.  The Government had already begun its investigation into OneCoin when Gilbert was arrested in September 2017, whereas Gilbert admitted to conduct related to the other two categories prior to the Government having any independent knowledge of that conduct.  This Court presided over the two-week jury trial of Mark Scott in November 2019, resulting in Scott's conviction for conspiracy to commit money laundering and bank fraud in connection with OneCoin.  The Court is therefore intimately familiar with the nature of the OneCoin scheme.  For the above reasons, the detail below is focused on Gilbert's specific involvement with OneCoin.

1.      **The OneCoin Scheme**

Gilbert met Ruja Ignatova, one of the founders of OneCoin, in June 2015 while he was in the process of purchasing a bank located in the country of Georgia called JSC Capital Bank ("JSC").  Ruja was a pre-existing customer of JSC at the time.  Three months after meeting Ruja, Gilbert attended a OneCoin event in Macau.  At the time, Gilbert was completely unaware that OneCoin was a fraud, and was impressed by the crowd that Ruja's business generated and the seeming professionalism of the operation.  Subsequently, he also began an intimate relationship with Ruja.  Gilbert became aware of Ruja's connection to OneCoin, although he did not understand it to be problematic at the outset.  In October 2015, Ruja told Gilbert that she was receiving threats of bodily harm that required her to use a security detail, and that someone broke into her home in Bulgaria and tried to burn it down.

Early on in the relationship, Ruja convinced Gilbert that there were many on-line doubters of her business, even some who unfairly called her a fraud, which caused her difficulty in maintaining bank relationships.  She started to seek Gilbert's help in managing around many

22

of the banks' concerns in doing business with her.  Gilbert did not have any personal knowledge

of an underlying fraud, and agreed to assist Ruja in overcoming her banking difficulties.  In an

attempt to minimize bank scrutiny, Gilbert provided false information and documents to banks in

order to move Ruja's money.  However, over time, the explanations that Gilbert received from

Ruja regarding the transfers she made and directed were often vague, illogical, and contradictory.

Ruja also asked Gilbert to cash multimillion-dollar checks for her because banks would not do

business with her.  Throughout this period, several banks closed Gilbert's accounts due to

suspicious activity, but he continued to move money for Ruja.  In total, Gilbert moved over $300

million for Ruja in many smaller increments between September 2015 and June 2016.  He was

given very little information about the source, purpose, or ultimate destination of those funds.

        Gilbert also assisted Ruja by issuing OneCoin prepaid cards through JSC.  Once again, at

the outset, Gilbert believed this was a legitimate business with significant business potential for

his company.  Between September 2015 and January 2016, he issued approximately 1,200 to

1,400 OneCoin prepaid cards that were to be used to pay refunds and commissions to OneCoin

members.  In the aggregate, OneCoin members used approximately $780,000 through these

prepaid cards.  Additionally, Gilbert introduced his long-time attorney, Mark Scott, to Ruja on

September 30, 2015, as Ruja stated that she had potential business deals and required attorneys.

At some point in the Scott-Ruja relationship, Scott began to transfer funds for Ruja, and the two

cut Gilbert out of their business relationship.

        Gilbert worked with other individuals and entities to move Ruja's money as well.  In

particular, Gilbert worked with a British company named Viola Asset Management ("VAM")

and its chairman, Christopher Hamilton.  Around February 2016, Gilbert arranged for

approximately $39 million to be transferred into a VAM foreign exchange account in Hong

23

Kong.  Hamilton then stole $32 million of those funds.  Gilbert subsequently retained "debt collection" specialists in the United Kingdom who tracked Hamilton, sent him threatening messages, and confronted him at his home.  Although Gilbert believed that the debt collection specialists might threaten Hamilton as part of their strategy to reclaim the stolen funds, he never thought that actual violence would be used.[7]  Gilbert would never condone the use of violence, did not condone it, and no violence was used against Hamilton.

Although Hamilton was considered the "victim" of the extortion charge, the Government has charged Hamilton with conspiracy to commit money laundering related to OneCoin as well. Among other charges, the Government charged Hamilton and his partner Robert MacDonald with wire fraud based upon the theft of the $32 million Gilbert was seeking to return.  On August 30, 2022, Judge Rimmer of the Westminster, England, Magistrates' Court issued a Judgment rejecting Hamilton's arguments in opposition to extradition and sending his case to the Secretary of State for a determination concerning his extradition.

More significantly, Gilbert turned the unfortunate debt collection incident into a positive for the Government as part of his cooperation.  Prior to his arrest, Gilbert had hired lawyers in London to seek the return of the money from Hamilton.  After his arrest, and with full knowledge that any money returned would be provided to the Government, Gilbert continued to spend millions in legal fees to get the money back, and in July and August 2018, he secured the return of $40 million to the Government.

Significantly, Gilbert did not perpetrate the OneCoin fraud itself.  He was not an employee or executive of OneCoin, and had no role in making any representations to OneCoin

---

[7]    The person who delivered the threatening messages, Dominic Welsh, was arrested in England on one charge of intimidation, but he was found not guilty at a trial in April 2019.

investors, recruiting members of the network, or developing or promoting any of OneCoin's
products.  Gilbert also played no role in soliciting or accepting funds from individual OneCoin
investors.

### 2.      The Bribes to Officials in Mexico

In early 2014, Gilbert met a Mexico-based businessman who also worked in card
payment processing and explored several card issuing and payment processing programs as
collaboration opportunities, but none ultimately materialized.  Subsequently, in 2016, Gilbert
paid approximately $250,000 to $300,000 to the businessman with the understanding that some
or all of the funds might be paid to an official of the Mexican government to help secure a
particular government contract.  Mr. Armenta's business never received a government contract.

### 3.      Illegal U.S. Gambling Proceeds

Between approximately August 2015 and March 2017, Mr. Armenta helped process
payments for online gambling websites that solicited bets from United States-based customers, in
violation of United States law.  The credit card transactions related to online gambling payments
were miscoded in order to conceal the true underlying merchant and the purpose of the
payments.

### B.      Gilbert's Cooperation with the Government

Gilbert's cooperation was extraordinary in many respects: the cooperation was
immediate upon arrest, and immediately impactful; it was broad in scope, including historical
information leading to arrests and charges filed against the leaders of the OneCoin scheme, and
numerous search warrants that further supported the charges and ultimate trial evidence against
others; ███████████████████████████; it put Gilbert and his family's safety at
significant risk; it secured tens of millions of dollars from overseas for the Government's coffers;
and it continued even after it was clear that the Government would no longer support a

downward departure under U.S.S.G. § 5K1.1.  Absent Gilbert's mistakes as described in Section III.C, *infra*, there is no doubt that he would have received a glowing and robust 5K1.1 letter from the Government.  While those mistakes must have, and already have had, consequences, Gilbert's extraordinary efforts still warrant significant credit as a downward variance, even if not under Section 5K1.1.

### 1.    Gilbert's Cooperation Was Immediate and Impactful

Gilbert was taken into custody and questioned for six hours on a sole extortion charge as he stepped off an airplane on September 13, 2017.  By the next day, Gilbert had agreed to cooperate with the Government's broader investigation of OneCoin, and was in a proffer session with the Government that very morning, and throughout that day.  Indeed, the proffer session extended to a remarkable 14 straight days, including weekends.  Most of those sessions lasted a full day.

At the early stages of those proffer sessions, Gilbert provided critical and timely information to the Government about the Government's main investigative target, Ruja Ignatova, the founder and leader of OneCoin.  Gilbert provided this information despite the fact that he had been in a romantic relationship with Ignatova at the time of his arrest. ███████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████

███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████



the Government was unable to apprehend Ignatova, and she remains at large today as one of the FBI's ten most wanted fugitives.

Gilbert also provided immediate and voluntary access to relevant documents.  He secured a vendor to preserve any documents from his business that the Government might ultimately want to collect, and provided access to his e-mails.  Also in September 2017, he permitted the investigating agents to perform a consent search of his business office in Florida.  The search

was done at 11:00 p.m. in order to maintain the confidentiality of the investigation.  Gilbert and his attorney were on the premises to assist the investigating agents in any way possible.

### 2.    Gilbert's Cooperation Put Him and His Family at Risk

From the very start of his proffer sessions with the Government, Gilbert had legitimate concerns for his safety and that of his family were he to cooperate against Ignatova and her organization.  Gilbert informed the Government in the early months of his cooperation that Ignatova knew disturbing details from his phone conversations with other people that took place in both his home and his aircraft.  Ignatova additionally referenced information she could only have obtained by hacking the emails of Gilbert and his employees.  For example, Ignatova questioned Gilbert about a jewelry purchase after his assistant paid the invoice on his behalf via her business email address.  Ignatova had previously boasted to Gilbert that she had the capability to monitor the communications of others.

 Although this information was immediately provided to both the agents and the prosecutors, it did not appear to Gilbert that the matter was investigated any further.  Gilbert was understandably

---

8    Although, to be sure, the Government may have taken security measures that Gilbert was unaware of, unknown measures could not and did not mitigate the enormous stress and emotional toll of Gilbert's cooperation.

distraught, fully recognizing by that point in time that Ruja was a dangerous woman with limitless resources, willing to go to extreme and bizarre lengths to obtain private details about him and his family.

The Government's evidence at the Mark Scott trial demonstrates that Gilbert's safety concerns were well-founded.  Konstantin Ignatov, the brother of Ignatova, testified that his life was threatened several times because of his affiliation with OneCoin.  He explained that, in March 2018:

> Somebody put a gun in my back and I was forced in a minivan.  Then I was taken out to the suburbs of Sofia where I got beaten up, a finger of mine was broken, and a gun was pointed out [sic] me.  And I was told that if Ruja disappeared with the money, that these people would come back and kill me.  And if I go to the police, that they will cut a body part out of me.

Hearing Tr. at 203-204, *United States v. Scott*, 17 CR 630 (ER) (S.D.N.Y. Nov. 6, 2019) (ECF No. 189).

The Government took Ignatov's safety concerns so seriously that it acknowledged them in Ignatov's plea agreement and offered him witness protection:

> It is understood that Ignatov's truthful cooperation with this Office is ***likely to reveal activities of individuals who might use violence, force, and intimidation against Ignatov, his family, and loved ones***.  Should Ignatov's cooperation present a significant risk of physical harm, this Office, upon the written request of Ignatov, will take steps that it determines to be reasonable and necessary to attempt to ensure his safety and that of his family and loved ones.  These steps may include application to the Witness Security Program of the United States Marshals Service, whereby Ignatov, his family, and loved ones, if approved, could be relocated under a new identity.

*See* Ignatov Plea Agreement dated September 27, 2019 (emphasis added).  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

Perhaps the Government originally chalked Gilbert's fears of Ruja hiring people to befriend his wife and bug his apartment up to paranoia, but by the time of the Mark Scott trial in November 2019, it presented facts legitimizing those fears to the jury.  Ignatov confirmed during his testimony in that trial that Ruja had in fact hired someone to befriend Gilbert's wife and surveil him and his family.  Ignatov explained that "an apartment below Gilbert Armenta was bought and a hole interceding was drilled so a microphone was placed in Gilbert's dorm." Hearing Tr. at 280, *United States v. Scott*, 17 CR 630 (ER) (S.D.N.Y. Nov. 6, 2019) (ECF No. 189).  One of Ruja's investigators and money launderers, Frank Schneider, sent "people [who] bought the apartment, and pretended to live in this apartment.  And he was also drilling the hole in the ceiling to place the microphone . . . [Ruja] had some person already on [Gilbert's] wife to pretend that she's friends with her, so that Ruja gets information what's going on there."  *Id.* at 281.

Additionally, throughout the investigation, it remained an open question who tipped off Ruja that the FBI was on to her, triggering her sudden disappearance in October 2017.  The agents assigned to Gilbert's case questioned him on whether they had code words or an agreement to tip each other off if law enforcement ever pursued one of them.  Gilbert, of course, consistently denied any role in Ruja's disappearance because, in fact, that was true.  Ignatov also clarified this point during his testimony, explaining that Ruja learned through the bugged apartment that "the FBI got [Gilbert] or something . . . he wants to make a deal with the FBI. And as part of this deal, he wants to offer Ruja and everything, according to her."  *Id*. at 282. Several days later, Ruja disappeared and has not been seen since.  *Id.* at 284-86.

Beyond the context of OneCoin, ██████████████████████████████
████████████████████████████████████████████████████████████



### 3.    Gilbert's Historical and Proactive Cooperation Was Extensive

Gilbert's cooperation efforts were exceptionally extensive.  He began providing

information and access to documents almost immediately upon his arrest and actively pursued

potential opportunities to proactively cooperate at every turn.  In addition to the 14 straight days

of proffering immediately following his arrest, Gilbert and his attorneys attended 12 additional

proffer sessions between November 2017 and September 2019, most of which lasted an entire

day. ████████████████████████████████████████████████████████████

████████████████████████████ The time that Gilbert spent proffering to the Government

with counsel is only the tip of the iceberg.  Gilbert also ████████████████████

████████████████████████████ greatly expanded the Government's

understanding of OneCoin, the players involved in that scheme, and the ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

     ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

Beyond proffers and recorded phone calls and in-person meetings, Gilbert spent hundreds of hours meeting, speaking, and texting with the agents assigned to his case, educating them on matters ranging from OneCoin █████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████. He worked with the agents and/or in other ways to advance the investigation literally every day. To aid the agents in their investigations of these matters, Gilbert set up 17 separate Dropbox folders that he used to share relevant documents and communications related to each of these topics. Many of these subjects involved Gilbert shedding light on the illegal activities of dangerous and powerful individuals, at great risk to Gilbert and his family. Nevertheless, his efforts at proactive cooperation were extensive to say the least.

### 4. Gilbert's Cooperation Resulted In Tremendous Benefits to Law Enforcement

Gilbert does not have perfect insight into the fruits of his extraordinary labor, but even based on publicly available information alone, it is clear that he has provided tremendous benefit to the Government.

First, Gilbert expended countless hours and millions of dollars of his own money on legal fees to secure the return of $40 million of OneCoin proceeds to the Government after it was seized by the City of London Police in April 2016. Despite knowing that 100% of the funds would go immediately to the Government, Gilbert tirelessly fought for the return of the $40

million and ultimately succeeded in delivering the funds to the Government in July and August 2018.

Second, Gilbert was the first person arrested in connection with the OneCoin scheme, and the Government's case has made incredible progress over the past five years, in large part due to the information that Gilbert provided.  This information has been used by the Government to secure numerous search and seizure warrants; the arrest warrants and indictments of Mark Scott, Konstantin Ignatov, David Pike, and Sebastian Greenwood; and the indictment of Ruja Ignatova.  Mark Scott's indictment resulted in a jury conviction on all counts following a trial before this Court in November 2019.  The Government successfully seized millions of dollars of property from Scott's homes prior to the trial based on Gilbert's cooperation.  David Pike, Mark Scott's business partner, also pleaded guilty to the charges against him relating to OneCoin.  Konstatin Ignatov was arrested in March 2019, but refused to cooperate with the Government until shortly before the Scott trial. ███████████████████████████████████████

████████████████████████████, and his sentencing is currently scheduled for February 16, 2023.  *United States v. Scott*, 17 Cr. 00630 (ER) (ECF 492) (S.D.N.Y.).  Sebastian Greenwood, Ruja Ignatov's OneCoin partner, was arrested in Thailand in November 2018, and pled guilty on December 16, 2022.  (*See id.* at ECF 508).  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  The Court has set a briefing schedule concerning the application of the sentencing guidelines to defendant Greenwood's conduct, has scheduled oral

argument for March 1, 2023, and has set April 5, 2023 as a sentencing control date.  (*Id.* at 37-38).

Most recently, on August 30, 2022, a district judge in England issued a judgment ordering the extradition of Christopher Hamilton to face charges in the United States.  *United States v. Hamilton*, [2022] EW Misc 1 (MagC) (30 Aug. 2022) (Ex. R). ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Due to extraordinary family circumstances, that same court refused to extradite Robert MacDonald on the same charges.

When the Government arrested Gilbert in September 2017, it was hoping to secure its first witness to help move the investigation forward.  In light of the tremendous progress outlined above—including tens of millions of dollars in recoveries with more anticipated, four additional arrests, five additional indictments, a successful jury trial conviction, and two additional guilty pleas—there can be no doubt that Gilbert provided extraordinary value to the Government.

### 5.     Gilbert's Cooperation Continued Even after His Remand

Gilbert continued to help the Government in any way that he could, even after the Government sought his remand in July 2019 and made clear that he would not be receiving a 5K1.1 letter.  His continued assistance began immediately after the Government originally submitted its application seeking remand to Judge Pauley on July 18, 2019. ███████████

_____

███████████████████████████████████████████████████████
███



Gilbert also assisted the Government as it prepared for Mark Scott's 2019 trial.  Gilbert's counsel had at least nine separate phone calls with the Government regarding various limited privilege waivers that the Government sought from Gilbert in order to get access to documents it wanted to use in the Mark Scott case.  Gilbert's counsel spent numerous hours reviewing and analyzing these requests and discussing them with Gilbert in the MCC; in each instance Gilbert provided what the Government needed to bolster its case.  However, all of this nuanced work was for naught because the Government ultimately decided that it had to have a blanket waiver from Gilbert for all of his privileged communications during the relevant periods of time.  Despite the frustration of expending so much time, energy and money (in legal fees) on wasted privilege analyses, Gilbert decided to grant the Government its blanket privilege waiver request so that it could best build its case.

Even during the Scott trial, Gilbert continued to help the Government.  In connection with the trial, the Government requested from Gilbert's counsel bank statements from Emirates NBD in Dubai.  Because Gilbert was at the MCC at the time, he could not access the bank statements himself, but the bank would only provide statements to a third party in-person.  As a result, Gilbert flew an employee to Dubai (again, at his expense) to physically pick-up the bank statements requested by the Government.

### 6.     The Ongoing Emotional, Physical, and Financial Strain from Gilbert's Cooperation

Gilbert's cooperation efforts over the course of two years took a tremendous toll on him mentally, physically, and financially.  As noted above, Gilbert's historical and proactive cooperation involved individuals who he knew could pose serious harm to himself and his family.  Indeed, the Government acknowledged as much in its cooperation agreement with Konstantin Ignatov.  He was living on edge knowing that Ruja had been surveilling his

communications and actions, and had the resources, tools, and motivations to continue to do the same or worse going forward. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

      While spending countless hours with Government agents, prosecutors, and his own counsel to prepare for such efforts, Gilbert also had to keep up an appearance to the world, including those in his own company ████████████████████████████████ ████████████████ that nothing had changed.  Given the situation he had put himself in, and the circumstances he agreed to live by as a cooperating witness, he felt that nobody, not even the federal government, could truly protect him or his family.  His circumstances included significant financial strain.  On the one hand, he was trying to keep up appearances of wealth so that he would not blow his status as a cooperating witness.  He did not want a complete change in circumstances to stick out like a sore thumb to those he was cooperating against.  Yet he could not really afford that kind of life.  The combination of circumstances caused incredible anxiety and stress.

      Adding to the financial stress was the fact that Gilbert spent tremendous sums in legal fees to aid in his cooperation.  For example, it cost considerable money to ultimately secure the funds seized in the UK for the Government, yet the Government would not let Gilbert offset any of the fees with the returned money.  It cost more money for Gilbert's attorneys to perform privilege analyses on scores of documents to aid in the trial against Mark Scott.  Gilbert agreed

to undertake these financial burdens because he wanted to assist the Government in any way he could, but in fact he could not afford them and he felt the financial strain on a daily basis.

As described below, Gilbert's cooperation was not without issue.  The weight of the anxiety and stress led to poor decisions, both related to his financial struggles, which put him in the devastating position he is in now—of losing his Section 5K1.1 letter after over two years of extraordinary cooperation that cost him dearly in terms of mental and physical stress, the security of his family, and resources.  While the difficulties of Gilbert's status as a proactive cooperating witness for two years are not an excuse or justification for his mistakes, they provide context to the Court for all of Gilbert's actions during that time—both the overwhelming good that he did and the mistakes that he made.

### 7.      The Sale of The Airplane

First, Gilbert sold a private airplane (the "Plane") without consulting the Government. Although the Plane was not expressly addressed in Gilbert's cooperation agreement, and was not subject to a written forfeiture agreement or order, Gilbert knew that the Government would likely want to be involved in any sale.  Over the course of his cooperation, through his counsel, Gilbert raised with the Government several times that he could no longer afford to maintain the Plane.  Without maintenance and periodic use, the value of a plane declines dramatically. Between the time of his arrest in September 2017 and December 2018, Gilbert spent over $1 million on maintaining the Plane, despite the fact that he was restricted from using it.  Gilbert also informed the Government that, without proper maintenance, the Plane would continue to decline steeply in value.  The Government responded in each instance that it was open to Gilbert

selling the Plane to mitigate his maintenance expenses, but that it would seek to be involved in any sale.

On January 18, 2019, the Government learned that the Plane was en route to the Bahamas and contacted Gilbert's counsel.  It turned out that Gilbert had sold the plane on December 28, 2018 without telling his attorneys or the Government, as the plane was causing him significant financial hardship.  When questioned by his attorneys, Gilbert, realizing that he had made a huge mistake that was going to have serious repercussions, falsely reported that a prospective buyer was flying the Plane on a test run.  This explanation was not a reasoned attempt at ultimately deceiving the Government, but rather a panicked mistake made in a split second of weakness and fear.  Within days, Gilbert informed the Government, through his counsel, that he had in fact sold the plane in December after securing a loan on the Plane in September.  At a subsequent proffer session on February 13, 2019, Gilbert provided the Government with all of the detailed information it requested in connection with the sale of the Plane.  Gilbert explained that he took a $1.2 million loan against the Plane in September 2018 because he was desperate for cash in order to continue to maintain the Plane and to pay business expenses, including payroll.  Two months earlier, a Florida state court had issued a writ of execution against Gilbert for approximately $350,000 in connection with unpaid flight maintenance services to a company called Jetex Flight Support, greatly exacerbating Gilbert's financial troubles.  Gilbert was unable to secure a loan with favorable terms, and the loan he did get had a maturity date of January 4, 2019, at which point the lender could exercise its right to take title of the aircraft in satisfaction of the loan and at great financial loss for Gilbert.

Ultimately, Gilbert was put in touch with a potential buyer, who made an offer on December 23, 2018 and insisted that the deal close by the end of the year.  Gilbert believed that

finding another buyer would be extremely difficult because he had not fully maintained the plane and it would therefore require significant capital to make the plane flightworthy again.  As it was, although he only owned the plane for two years, he was forced to sell it at a $1.3 million loss.  With very little time to execute the deal in the middle of the holiday season, Gilbert went against better judgment and moved forward.  He sold the Plane for $2.1 million on December 28, 2018; $1.2 million of which went to pay back his loan against the Plane.  Of the remaining funds, an additional $80,000 went to pay off the interest on the loan, another $30,000 went to pay off a maintenance lien on the Plane for hangar rent and fueling, and $5,000 went to services rendered by the lender in connection with the sale of the Plane.

As a result of the Plane issue, the Government moved to modify Gilbert's bail conditions to disallow international travel, tightly restrict domestic travel, and impose a daily curfew enforced by a voice verification monitoring system.  Gilbert consented to these modifications and complied with them fully.

## 8.    The Kawase Check

On July 15, 2019, Gilbert flew to New York for a routine scheduled proffer session with the Government regarding his ongoing cooperation efforts.  At the start of the proffer, the Government informed Gilbert's counsel for the first time that it had independently learned that Gilbert was involved in cashing a $5 million U.S. Treasury tax refund check (the "Check") in April 2019.  Gilbert provided the Government with details during that and subsequent proffer sessions.  He also offered the Government full and immediate access to his phone and emails at the July 15 proffer session when he was unexpectedly confronted about the Check.  FBI agents did in fact review his phone during the course of that meeting.

The Check was made out to a Japanese national named Yoshiteru Kawase, whom Gilbert had never met.  The Check was brought to Gilbert for cashing by a business associate named

Armando Guzman, who informed Gilbert that Kawase was a client of his and promised Gilbert 20% of the Check proceeds in exchange for cashing the Check.  Gilbert believed that Armando owed him money from previous business dealings.  Gilbert thus decided not to give the $5 million to Armando once the Check was cashed, and used the money for his own personal and business reasons.[11]

Gilbert had no role in, nor knowledge of, the circumstances surrounding the origination of the Check, which the Government does not dispute.  However, Gilbert fully acknowledges that he ignored a series of red flags surrounding the Check that should have prevented him from participating in the cashing of the Check.

After an intense week of proffer sessions and meetings between Gilbert, his attorneys, and the Government, Gilbert was remanded to the MCC on July 19, 2019.  Despite his remand,

---



He also had no confidence that the federal agents, despite their best intentions, could actually keep him and his family safe.

Gilbert still prepared extensively for and attended two additional proffer sessions with the Government on August 29, 2019 and September 6, 2019.

### 9.        Consequences of Gilbert's Actions

Once remanded, Gilbert remained at the MCC for eight horrific months until March 26, 2020, when this Court allowed him to move into home detention based on his health conditions and the threat of the COVID-19 pandemic.  As discussed above, Gilbert continued his cooperation efforts from the MCC.  However, because of Gilbert's violations of his cooperation agreement and his remand, the Government ultimately elected not to call him as a witness in the Mark Scott trial shortly before that trial began in November 2019.  Thankfully, in part as a result of Gilbert's cooperation, Ruja's brother Konstantin Ignatov had been arrested back in March 2019 and decided to cooperate.  Ignatov's testimony, as well as other evidence secured by the Government as a result of Gilbert's cooperation, was sufficient to secure the conviction of Mark Scott and the guilty plea of his coconspirator David Pike.

While fully acknowledging that the sale of the Plane and the cashing of the Check and subsequent use of its proceeds were tremendous, shameful errors in judgment for which Gilbert is fully responsible, in both these instances he was feeling tremendous financial pressure and even had to take loans from his wife.  At both points in time, Gilbert was struggling to pay his employees, his office leases and other business expenses, and his legal fees.  His business was not making money and his expenses were piling up.  His most valuable property was either securing his bail or potentially subject to forfeiture, so he had nothing to sell or leverage.  It was not easy for Gilbert to admit that he was struggling financially to anyone.  He is a proud person who, as echoed time and again in his supporting letters and videos, takes immense satisfaction in serving as a generous caretaker to all of his family, friends, and employees.  It has always been important to him that people perceive him as a strong and stable force in their lives.  He realizes

43

that this is an aspect of his character that he must work to let go of in order to move forward productively from the darkest chapter of his life.  Words cannot express how deeply Gilbert regrets his participation in the activities that led to his remand, as well as his involvement in the crimes to which he pled guilty.

## **LEGAL ANALYSIS**

### IV.    **The Advisory Sentencing Guidelines Calculation**

The parties agree that Gilbert's final offense level should be calculated under the money laundering guideline, U.S.S.G. § 2S1.1.  Pursuant to § 2S1.1(a)(1), the base offense level is determined for the underlying offense from which the laundered funds were derived if (A) the defendant committed the underlying offense and (B) the offense level for that offense can be determined.  Here, the parties agree that if subsection (a)(1) were to apply, the guideline for the underlying offense of conspiracy to commit wire fraud is Section 2B1.1, and the applicable base offense level is 7 pursuant to Section 2Bl.l(a)(1).  The Government seeks a 30-level enhancement under Section 2B1.1(b)(l)(P), a 6-level enhancement under Section 2B1.1(b)(2)(C), a 2-level enhancement under Section 2B1.1(b)(10)(C) and a 3-level enhancement pursuant to Section 3B1.1(b).  The Government's proposed calculation is an offense level of 48, which is literally off the Guidelines Sentencing Table, which stops counting at a level 43, or **life** in prison for someone with no criminal history.  For sentencing purposes the defense will not contest the loss amount calculation, but urges the court to apply a substantial downward variance with respect to such calculation.  In addition, the defense objects to the application of the three additional enhancements proposed by the Government, although it is an academic exercise given the absurdity of the Guidelines calculations as applied to Gilbert's conduct.

A.      A Substantial Downward Variance Is Warranted Based on the Loss
        Calculation

As this Court and others have recognized, the guidelines place an "inordinate emphasis"

on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases,

without however, explaining why it is appropriate to accord such huge weight to such factors."

*United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (JSR); *United States v.

Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("[T]the

Sentencing Commission's loss-enhancement numbers do not result from any reasoned

determination of how the punishment can best fit the crime, nor any approximation of the moral

seriousness of the crime.").

Consistent with this belief, courts in the Second Circuit have not hesitated to disagree

with guidelines calculations and impose sentences far below the advisory guideline range in

order to avoid injustice.  For example, in *United States v. Adelson*, a stock manipulation case

where the guidelines calculation was based on a $260 million loss, the court disagreed with the

guidelines results finding that they place an "inordinate emphasis on the loss calculations" and

were "wildly off-base." 441 F. Supp. 2d 506, 509, 515 (S.D.N.Y 2006), *aff'd* 301 Fed. App'x 93

(2d Cir. 2008).

The *Adelson* court explained, "where as here, the calculations under the guidelines have

so run amok that they are patently absurd on their face, a Court is forced to place greater reliance

on the more general considerations set forth in section 3553(a), as carefully applied to the

particular circumstances of the case and of the human being who will bear the consequences."

*Id.* at 515.  *See also United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (finding 20-year

sentences for $300 billion dollar fraud was "not merely harsh" but "dramatically more severe

than c[ould] be justified"); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008)

(finding that the fraud guidelines "have so run amok that they are patently absurd on their face"); *United States v. Ferguson*, 584 F. Supp. 2d. 447 (D. Conn. 2008) (imposing sentences on five defendants ranging from one year and one day to four years' incarceration for their role in a $500 million fraud despite an advisory guideline range of life in prison).  Indeed, in *United States v. Algahaim*, the Second Circuit itself remanded a fraud case for resentencing, inviting district courts to consider non-guidelines sentences where a low base offense level for a fraud offense is dwarfed by a loss enhancement.  842 F.3d 796, 800 (2d Cir. 2016) (recognizing the imbalance of a base offense level of six for fraud with a 12-level enhancement for loss amount, which amounted to a three-fold increase in the defendant's offense level).

A non-guidelines sentence is particularly appropriate here, where the advisory guidelines range, as suggested by the Government and calculated in the PSR, provides for a term of imprisonment up to 100 years.  (*See* PSR ¶ 137.)  This is an astronomical number and indubitably one that is "patently absurd."  *Adelson*, 441 F. Supp. 2d at 515.  The suggested loss enhancement alone represents more than a five-fold increase in Gilbert's offense level, which is dramatically larger than that in *Algahaim* and screams out for a substantial variance from the guidelines.  See <u>Algahaim</u>, 842 F.3d at 800.

**B.    A 6-level Enhancement under Section 2B1.1(b)(2)(C) Is Unwarranted**

Section 2B1.1(b)(2) directs the Court to apply the greatest increase in offense level, if the offense---

     (A)     (i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by **2** levels;

     (B)     resulted in substantial financial hardship to five or more victims, increase by **4** levels; or

     (C)     resulted in substantial financial hardship to 25 or more victims, increase by **6** levels.

"In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—(i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit."  U.S.S.G. § 2B1.1 (Application Note 4(F)).

The Government has not provided the defense with any evidence establishing that Gilbert's conduct caused "substantial financial hardship" to 25 or more victims.  Nor can such evidence be found in the PSR, which merely notes that the Government contends that the enhancement applies because "those facets of the OneCoin Scheme were clearly reasonably foreseeable to the defendant."  Gov't Resp. to PSR Objections ¶ 46.  Moreover, foreign victims of a foreign fraud should not be considered for purposes of applying the enhancement in Section 2B1.1(b)(2)(C).  *See United States v. Turner*, 624 F. Supp. 2d 206, 218 (E.D.N.Y. 2009) (holding that loss attributable to a foreign fraud perpetrated on foreign victims should not be considered in calculating loss amount under the guidelines).[12]

In the absence of such evidence, this enhancement should not apply.

### C.      Section 2B1.1(b)(10) Does Not Apply

---

[12] For the same reason, with respect to determining the loss amount for the fraud count, foreign conduct aimed at foreign victims should not be considered.  *See United States v. Azeem*, 946 F.2d 13, 16 (2d Cir. 1991) (remanding for resentencing where the district court considered Pakistan-Cairo drug transaction, holding that "the Cairo transaction should not have been included in the base offense level calculation because it was not a crime against the United States").

The Government also seeks a 2-level enhancement under Section 2B1.1(b)(10)(C), which requires both that the offense conduct involved sophisticated means and that the individual defendant "intentionally engaged in or caused the conduct constituting sophisticated means." The second prong of subsection (C) was added to the guidelines in 2015, as the Sentencing Commission concluded that "basing the enhancement on the defendant's own intentional conduct better reflects the defendant's culpability." *See* April 30, 2015 Amendments to the Sentencing Guidelines, at 29-30.

Section 2B1.1(b)(10)(C) is inapplicable to Gilbert. Gilbert played no role in establishing or executing the majority of the sophisticated means listed in paragraph 47 of the PSR to establish the enhancement. Specifically, Gilbert was not involved in (i) operating OneCoin's MLM pyramid scheme; (ii) holding ostentatious conferences; (iii) retaining advertising agencies to create and distribute OneCoin marketing materials; (iv) retaining law firms to author purported legal opinions about OneCoin; (v) instructing members to lie about the purpose of wire transfers when purchasing OneCoin packages; or (vi) using OneCoin's sophisticated online back-office to trick OneCoin members. Nor did he aggregate OneCoin Scheme proceeds, maintain OneCoin accounts at financial institutions worldwide to facilitate the receipt of OneCoin proceeds, or play a role in soliciting or accepting funds from individual OneCoin investors. While Gilbert did help disguise funds transmitted by Ruja Ignatova and transmitted them back to her, this activity had nothing to do with using sophisticated means to perpetrate the OneCoin fraud on investors, and was not particularly sophisticated. Application of this enhancement in these circumstances would be tantamount to determining that the enhancement applies to virtually every money laundering offense.

### D.     A Manager or Supervisor Enhancement Is Inappropriate

The Government asserts that Gilbert deserves a three-point aggravating role enhancement under Section 3B1.1(b).  In the context of this case, which is premised on the OneCoin fraud scheme, the defense does not believe an aggravating role enhancement is appropriate or necessary.

"The government bears the burden of proving facts supporting the application of [each] Guidelines provision . . . by a preponderance of the evidence," *United States* v. *Kent*, 821 F.3d 362, 368 (2d Cir. 2016), including any leadership enhancement, *United States* v. *Holguin*, 436 F.3d 111 (2d Cir. 2006).

Section 3B1.1(b) provides for a three-level sentencing enhancement if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]"  The Second Circuit is clear that "a defendant may properly be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants."  *United States v. Beckford*, No. 05 Cr. 944 (RWS), 2006 WL 1390414, at *4 (S.D.N.Y. May 17, 2006) (quoting *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (brackets and ellipses removed)).

In support of its argument, the Government notes, "the defendant ran several corporate entities and managed a number of employees who assisted the defendant in perpetrating the offenses."  (Gov't Resp. to PSR Objections ¶ 50.)  The crux of this case, however, is the OneCoin fraud scheme.  There is no evidence, nor does the Government even contend, that Gilbert supervised or managed anyone in connection with that fraud scheme.  While the Government might contend that Gilbert instructed certain people in his business office to assist

him with certain money transfers, in the context of the OneCoin scheme, imposing an aggravating role enhancement on Gilbert is inappropriate.

### E.      The Total Offense Level and Corresponding Sentencing Range

With a base offense level of 7 pursuant to Section 2B1.1(a)(1), an increase of 30 levels for a loss of more than $550,000,000 (prior to the application of any downward variance),[13] a 2-level enhancement because Gilbert was convicted under 18 U.S.C. 1956, and a 3-level reduction for acceptance of responsibility pursuant to Section 3E1.1, the total offense level should be 36. Because Gilbert has no prior offenses and thus no criminal history points, the corresponding guidelines range should be 188 to 235 months (prior to the application of any downward variance).

## V.      The § 3553(a) Factors Call for a Non-Guidelines Sentence

As this Court is aware, the Supreme Court held in *United States v. Booker* that the Sentencing Guidelines are "effectively advisory."  543 U.S. 220, 245 (2005).  Although the Court is obligated to give fair consideration to the guidelines, "a district court may not presume that a Guidelines sentence is reasonable."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).  The factors set forth in 18 U.S.C. § 3553(a) are therefore increasingly important because they guide the Court in "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this

---

[13]   The amount of laundering was less than $550,000,000.  To the extent that loss amounts attributable to foreign conduct aimed at foreign victims are not considered for Guidelines purposes, then the loss amount based on the laundering conduct increases the offense level by 28, rather than 30.

tradition is the principle that the punishment should fit the offender and not merely the crime."

*Pepper v. United States*, 131 S.Ct. 1229, 1240 (1996).

The mandate of 18 U.S.C. § 3553(a) directs the Court to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing.  *United States v. Stewart*, 590 F.3d 93, n.30 (2d Cir. 2009).  In *Rita v. United States*, 51 U.S. 338 (2007), the Supreme Court summarized the many factors a sentencing court should consider before exercising its latitude to "make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." [14]  *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).

The factors set forth in § 3553(a) counsel in favor of a sentence of time served for Gilbert Armenta.  In conducting an analysis of the § 3553(a) factors, Gilbert respectfully requests that the Court give particular consideration to the following points: (1) Gilbert quickly and fully accepted responsibility for his conduct and cooperated extraordinarily with the Government; (2) Gilbert's personal history and characteristics are indicative of a civic-minded, family-focused, caring man who is capable of productively moving forward from this horrific chapter in his life and becoming a societal asset; and (3) the need for just punishment and deterrence has been satisfied.

### A.    Gilbert's Acceptance of Responsibility and Substantial Cooperation

Gilbert would never assert that his cooperation was perfect, but the fact remains that upon arrest he immediately embarked on extraordinary efforts to assist the Government in a variety of

---

14. In fashioning a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a) requires the Court to consider: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution."  *Id.* at 347-48.

areas.  Despite the serious repercussions to his and his family's lives, Gilbert decided very

quickly to own up to his conduct and plead guilty to the charges against him.  It was not an easy

decision—Gilbert recognized that cooperating would compromise the safety of himself, his

family, and his employees, and place him in precarious situations potentially for years.

Ultimately, however, unlike every other alleged and convicted OneCoin conspirator arrested to

date, he did not hesitate in choosing the side of justice.  Though his plea and cooperation

required Gilbert to endure significant negative press through the Mark Scott trial, to provide

information about and potentially testify against people whom he considered friends in some

cases and ████████████████████████, and to lose the respect of family, friends, and

colleagues, Gilbert knew that confronting his past and accepting responsibility for his actions

was the only way to make amends for his wrongs and move forward with his life.

As discussed in detail above, Gilbert's cooperation in this case has been extraordinary.

He was the first and only individual who cooperated prior to the Government charging the

OneCoin scheme.  Gilbert met with the Government more than 30 times over the course of two

years, including after he had already been remanded to the MCC.  He spent hundreds of hours

proffering valuable information on topics that the Government had some prior knowledge of, as

well as topics it had no knowledge of at all.  Gilbert provided unfettered access to massive data

collections across all of his electronic devices and he waived privilege repeatedly across broad

swaths of information to help the Government build a stronger case against Mark Scott and

others.  He illuminated the relationships among participants in the schemes on which he

proffered and their specific roles, key dates and timelines, complex cash flows, and the locations

of major players and events.  In short, Gilbert lined up all the red flags in an order that was clear

and useful to the Government in helping it to build its trial case against Mark Scott, indict

various coconspirators, and bring in other cooperators.  Additionally, Gilbert expended countless

hours and millions of dollars of his own money on legal fees in order to secure the return of $40

million of OneCoin proceeds to the Government after it was seized by the City of London Police

in April 2016.  Although Gilbert knew that he would never receive one dime of that money, he

continued to fight vehemently for it until its return in July 2018.

Although the Government elected not to call Gilbert as a witness in the Mark Scott trial

due to his own mistakes, Gilbert's preceding two years of cooperation assisted the Government

in gathering evidence and bringing charges against several OneCoin defendants, and Gilbert's

streamlining of evidence for the Mark Scott trial and presumably trials to come should be

considered to his credit.  Even in the harsh light of his errors, Gilbert's level of cooperation is

above and beyond that of many defendants who do ultimately receive letters of cooperation

pursuant to 5K1.1.

There have been many instances of S.D.N.Y. courts showing leniency in the face of

extensive cooperation, despite missteps that have occurred in the course of that cooperation.  For

example, in *United States v. Williams*, defendant Williams was sentenced to time served for his

crimes of conspiracy to commit wire fraud, wire fraud, aggravated identity theft, conspiracy to

commit money laundering, bank fraud, and making false statements, despite a guidelines range

of 97 to 121 months and 14 years of criminal behavior.  Sentencing Tr. at 26-28, 33-34 *United*

*States v. Williams*, 16 CR 436 (KMW) (S.D.N.Y. Dec. 18, 2018) (ECF No. 306).  Williams

originally entered into a cooperation agreement with the Government, but he then withheld

information from the Government and made false statements in the course of his cooperation

agreement; he was remanded to the Metropolitan Detention Center (the "MDC") in Brooklyn for

nearly nine months prior to sentencing and did not testify at any hearing or trial.  *Id.* at 10, 20.

Like Gilbert, Williams provided substantial assistance to the government in the prosecution of others involved in complex, large-scale fraud and was crucial in bringing additional charges and successful prosecutions against other defendants. *Id.* at 9. Like Gilbert, Williams participated in numerous meetings with the Government for hours on end—providing key pieces of multiple puzzles and disclosing years of fraudulent conduct that was largely unknown to the Government. *Id.* Judge Kimba Wood sentenced Williams to time served in light of the nearly nine months he spent under harsh conditions at the MDC, his cooperation efforts, acceptance of responsibility, demonstration of remorse, and desire to continue on a path to rehabilitation. *Id.* at 25-38, 33-34.

In *United States v. Howe*, defendant Howe was sentenced to five years of probation following six months spent at the MCC presentencing, despite a guidelines range of 135 to 168 months. Sentencing Tr. at 13, 29, 34, *United States v. Howe*, 16 CR 00632 (VEC) (S.D.N.Y. Apr. 5, 2019) (ECF No. 86). Howe pled guilty to eight felonies, including wire fraud, tax fraud, extortion, bribery, and various conspiracies in connection with "one of the most serious of federal crimes," public corruption. *Id.* at 12, 30. For years, Howe was at the center of two sophisticated corruption schemes—the Percoco and "Buffalo Billions" schemes. *Id.* at 14. After entering into his cooperation agreement, however, Howe continued to behave "thoughtlessly and recklessly" with regard to money and, in an unprecedented move, the Government put Howe in jail at the MCC in the middle of his testimony because there was probable cause to believe he had engaged in a fraud that the Government did not know about. *Id.* at 16-17. In determining Howe's sentence, Judge Caproni considered Howe's post-cooperation transgressions, his six-month "taste of jail" that was "not like many cooperating witnesses in white-collar cases," his 20 months of significant cooperation that put a damaging spotlight on himself and his family, and the fact that Howe was the only person who came forward to cooperate before anyone else was

convicted.  *Id*. at 15, 17-18, 29, 31-32.  Even though the Government was already aware of the

corruption schemes when Howe began cooperating, he helped them to narrow down particular

timeframes and communications.  *Id*. at 16.  After weighing the nature and circumstances of the

offense, Howe's history and characteristics, his ability to abide by the terms of his pretrial

release, and the deterrence impact achieved by six months at the MCC, Judge Caproni ordered a

sentence of five years of probation.  *Id*. at 27, 32-33.  *See also United States v. Monsegur*, 11 Cr.

666 (cooperating witness, facing a Guidelines range of 259-317 months, and who had bail

revoked during cooperation period and as a result served 7 months in prison pre-sentencing,

sentenced to time served); *United States v. Sweet*, 18 Cr. 8 (cooperating witness, facing a

Guidelines range of 41-51 months, failed to inform government of all criminal activity prior to

signing cooperation agreement, made false statements on tax returns after pleading guilty, and

failed to acknowledge the additional criminal activity during cross examination at trial,

sentenced to time served); *United States v. Majidi*, 18 Cr. 328 (cooperating witness, facing a

Guidelines range of 161-188 months, admitted to lying to government about transferring the

proceeds of the sale of property in Iran, which conduct the government learned about during

trial, sentenced to time served).

     Like Williams and Howe, Gilbert exhibited imperfect but still extraordinary cooperation

in providing the Government extensive information that it has used to secure guilty pleas, trial

convictions, search and seizure warrants, and indictments in a complex fraud scheme.  Like

Williams and Howe, Gilbert has experienced over 8 months of life-changing incarceration under

especially harsh conditions at the MCC.  He has also been subject to strict home confinement

upon his release from the MCC for close to three years.  Like Williams and Howe, Gilbert came

forward to help build the Government's knowledge of various fraud schemes long before anyone

else did.  And like Williams and Howe, Gilbert now respectfully requests that the Court demonstrate leniency and impose a sentence of time served.

Indeed, while the Government has decided not to provide a 5K1.1 letter to Mr. Armenta, notwithstanding his extraordinary two years of cooperation, courts have credited cooperation efforts at sentencing to defendants who did not ultimately plead guilty pursuant to a cooperation agreement, much less receive a Section 5K1.1 letter from the government.  *See, e.g., United States v. Cohen*, 18 Cr. 602 & 18 Cr. 850 (WHP) (S.D.N.Y. Jan. 8, 2019) (ECF 31 at 34:17-19) (noting that "cooperation, even when it is not the product of a formal agreement, should be encouraged where information is provided that advances criminal investigations"); *United States v. Holder*, 18 Cr. 36 (defendant, who provided information to government but did not plead guilty pursuant to a cooperation agreement and did not receive a 5K1.1 letter, and who faced a Guidelines range of 57-71 months, sentenced to 8 months' imprisonment in part due to efforts to cooperate).

### B.    Gilbert's Personal Characteristics Warrant Leniency

When analyzing the history and characteristics of an individual, courts frequently look to an individual's good deeds as a basis for exercising leniency.  *See Adelson*, 441 F. Supp. 2d at 513-14 (imposing a non-guidelines sentence where sentencing letters detailed "good deeds [that] were not performed to gain status or enhance [the defendant's] image"); Sentencing Tr. at 26, 35, *United States v. Collins*, 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013) (ECF No. 244) (imposing a sentence of a year and a day, which was significantly below the guidelines range of 95 years, based in part on the defendant's good deeds, "most [of which] were unknown to all but a few people until the time of his sentencing . . . in stark contrast to many of the white collar defendants we see in this Court"); Sentencing Tr. at 34, 81, 89, *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. May 11, 2018) (ECF No. 791) (imposing a sentence of 48 months

imprisonment despite a guidelines range of 235 to 293 months where sentencing letters described the defendant's "various acts of kindness for individuals who are in need of medical care, to citizens and folks from [his] home town, to the citizens of Macau, including children as well as the elderly").

By all accounts, Gilbert is a loyal and generous person who is giving in many meaningful ways, without seeking gratitude or expecting anything in return.  Gilbert's wife explains, "He's always the one to help people and to give more than he can afford at times.  He has been without fail my mentor and I also owe a large part of my success to him."  Basia Armenta Video, Ex. C. She describes one encounter where Gilbert gave $50 to a homeless mother with child.  When asked why, Gilbert explained: if she had a choice she wouldn't beg.  *Id.*  Gilbert's brother, Charlie, outlined the ways in which Gilbert steps in to support Charlie both monetarily and emotionally ████████████████████████████████████████.  Charlie Armenta Video, Ex. A.  Gilberts' sons also emphasize the generosity and support he provides to others. His younger son, Oliver, explained, "Even if he didn't like you, he would still help you just because if you were willing to ask and you were willing to get help you would always receive it."  Oliver Armenta Video, Ex. E.

Gilbert's dedication to others' needs illustrates his true nature apart from the conduct that brings him before the Court.  Importantly, the many instances of kindness noted in the attached letters and videos of support indicate that this aspect of Gilbert's nature is not merely post-arrest efforts or episodic—he has been consistent in his willingness to serve others, regardless of his level of wealth at any given point in time.  In 1989, when Gilbert was barely able to support himself, he still showed his true character when he drove hundreds of miles to pick up his brother Charlie from the hospital ████████████████████████████████████████

███████.  Charlie Armenta Video, Ex. A.  Gilbert cares for others in ways that transcend financial means—the project management curriculum he designed for fellow inmates at the MCC, the support he gave to his unseasoned employee Giselle that enabled her to thrive, or the persistence with which he showed his love to his son Oliver during his rocky transition into life in Florida.

Some people may not have the strength or will to permanently close a toxic chapter in their lives and start anew without slipping back toward their old demons.  Gilbert Armenta is among the few who have already accomplished this feat.  Despite spending five years of his life as an alcoholic and drug addict—barely functioning and lost to his family and friends—despite a family history that includes ████████████████████████████████████, Gilbert successfully closed his own chapter as an addict and never slid backwards.  He has consumed neither alcohol nor drugs for the last 35 years.  Instead, he has raised two beautiful sons whom he considers to be his greatest accomplishment, taken care of his parents, siblings, friends, and employees, and given back to his community in countless ways.  Gilbert has demonstrated that he is capable of total rehabilitation, and he is asking this Court for the opportunity to do it again.

Considering the above observations and his past success at reforming his life, Gilbert is worthy of another chance.  "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *Adelson*, 441 F. Supp. 2d at 513-14 (JSR).  Accordingly, Gilbert respectfully urges the Court to impose a sentence of time served so that he can continue to care for his family and be an asset to society.

### C.       The Need for Just Punishment and Adequate Deterrence Has Been Satisfied

Section 3553(a)(2)(B)-(C) instructs the Court to impose a sentence that provides just punishment and adequately deters future criminal conduct by the individual defendant and by

society generally.  Both significant punishment and substantial steps toward deterrence have already been accomplished in this case.

With respect to specific deterrence, courts deem the requirements satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake . . . constitutes a source of both individual and general deterrence." *United States v. Gaind*, 829 F. Supp. 669, 679 (S.D.N.Y. 1993) (VLB).

As a direct consequence of his criminal conduct, Gilbert lost his reputation and many of his business associates.  As a result of the news coverage of his involvement in OneCoin, he has been essentially unable to maintain any domestic bank accounts.  Even banks based abroad have been largely unwilling to hold accounts for him.  These circumstances render it virtually impossible for Gilbert to move money to even a fraction of the degree he did for Ruja.  Further, Gilbert provided substantial assistance to the Government at great expense to his family members, who now feel constant fear for their own safety and shame because of the information that Gilbert disclosed.  He accepts that none of these consequences would have befallen his family but for his own conduct.

Finally, as outlined in greater detail above, Gilbert also spent eight months under especially harsh conditions at the MCC— ███████████████████████████████ ███████████████████████████████ and fearing for his life after contracting COVID-19 there in March 2020.  Gilbert will be forever changed by these experiences, and he will carry that knowledge with him as a deterrent.  The experience has been traumatizing, and far worse than any minimum-security camp or low-security facility near his family, which is where the BOP

would ultimately designate him.  The eight months that Gilbert has been incarcerated at the MCC, separated from his family, is not on par with eight months at a camp or low-security facility and should be measured as much greater.

There has been widespread recognition among Southern District judges of the deplorable conditions at MCC (as well as its Brooklyn counterpart, MDC).  Stated former Chief Judge Colleen McMahon of the MCC, "It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that."  *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. May 12, 2021) (ECF 35 at 18:19-22; 19:17-20; 34) ("I can't give [the defendant] a just sentence . . . My hands are tied.  I have to give her a five-year sentence and that I will do, 60 months.  The 75 days that she spent in the SHU takes care of the other three [months].").

Courts often account for the barbaric conditions in custody by imposing lesser sentences than they otherwise would—that is, by affording additional weight to the time spent in custody. As recently described by Judge Engelmayer:

> The conditions under which you have served your six and a half months in prison [at MCC] have been dreadful.  No one would wish them on any other human being, and you appear, although it does not appear to have been medically documented with certainty, to have perhaps contracted COVID-19 while in the MCC . . . I am mindful, as I said earlier, that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years.  I'm mindful that you may have contracted COVID-19 while in prison.  I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful.  Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close.  **My colleagues and I commonly informally credit prisoners who have served time awaiting extradition in dreadful prisons overseas with more time served than measured by the calendar.  The same logic applies here, and then some.**

*United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. May 12, 2022) (ECF 29 at 32:3-8;

36:10-21; 27) (sentencing inmate to time served, plus one day) (emphasis added); *see also*

*Gonzalez,* 18 Cr. 669 (JPO) (ECF 250 at 17:17-25) (finding that 24 months of incarceration in

"extraordinarily harsh" conditions was "more punitive, that *it's essentially the equivalent of*

*either time and a half or two times what ordinarily would be served*") (emphasis added); *United*

*States v. Lavidas*, 19 Cr. 716 (DLC) (S.D.N.Y. July 30, 2020) (ECF 127 at 56:6-12, 59:6—60:1)

(sentencing defendant to one year and one day, rather than potentially a two-year sentence, due

to his good character and "suffer[ing]" at MCC)*; cf. United States v. Batista*, No. 18 Cr. 319

(LTS), 2022 WL 1997173, at *4 (S.D.N.Y. June 6, 2022) (reducing sentence by twenty months

and noting that "[defendant's] experience in custody during the COVID-19 pandemic—at

several different facilities [one of which was MCC], each with its own unique challenges—has

been harsher and more punitive than the Court anticipated it would be when [defendant] was

sentenced, on the eve of the pandemic, in January 2020").

Judges have also recognized that drugs are widely available in the MCC and MDC,

which, as addressed at § 1.B, E, *supra*, was one of the most aggravating aspects of Gilbert's

incarceration, in light of his status as a former addict.  *See United States v. Morgan*, 19 Cr. 209

(RMB) (S.D.N.Y. May 8, 2020) (ECF 90 at 15:17-19, 34:14-24) (describing MDC and MCC as

"[D]irty.  They are infested with drugs.  You can get drugs and other contraband at the drop of a

hat.  There is violence that goes on[,]" and sentencing inmate to time served (15 months), where

the guidelines range was 41-51 months and the stipulated guideline range was 33-41 months).

In assessing Gilbert's 253 days in custody, the Court should also credit more heavily the

unduly punitive nature of the 53 days (over 20%) that he spent either in lockdown due to the

facility issues discussed *supra*, at § I.E and in the SHU, not a single day of which was due to any

disciplinary issue of his own.  And as noted earlier, Gilbert was permitted outside (on the MCC's rooftop) only one time during the 253-day period of incarceration.  Moreover, it would be inconsistent with recent DOJ policy to require Gilbert to return to custody after he has been lawfully complying with the terms of his release to home confinement.  The DOJ's Office of Legal Counsel ("OLC") December 21, 2021 Opinion titled "Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency" (the "OLC Opinion") is instructive.  45 Op. O.L.C. __, 2021 WL 6145876 (Dec. 21, 2021).  The OLC Opinion represented an explicit "depart[ure]" from earlier DOJ guidance, and concluded that when the COVID-19 emergency ended, the Bureau of Prisons had "discretion to permit prisoners in extended home confinement to remain there."  (*Id.* at *1, 15.)  While, of course, Gilbert has not yet been sentenced, the policy rationales underlying the OLC Opinion apply to Gilbert with no less force.

The DOJ recognizes that "home confinement is generally supposed to occur at the end of a prisoner's sentence as a terminal placement . . . [and] the broader purpose of home confinement . . . is to 'afford th[e] prisoner a reasonable opportunity to adjust to and prepare for the reentry of th[e] prisoner into the community."  (*Id.* at *14) (citing 18 U.S.C. § 3624(c)(1)).  Today, "long-term home confinement—while not the norm—is becoming less unusual, given the measures Congress has adopted authorizing longer home-confinement placements for elderly and terminally ill offenders."  (*Id.* at *14) (citing 34 U.S.C. § 60541).  While the OLC Opinion recognizes that "in some cases, of course, BOP might reasonably conclude that penological goals would be best served by returning a prisoner in home confinement to a prison facility[,]" for the reasons set forth in this Memorandum, such goals are not advanced by returning Gilbert to custody.

With respect to general deterrence, further incarceration for Gilbert is not required to satisfy this sentencing aim.  Here, the stigma, public humiliation, loss of reputation, negative publicity, indictment of numerous coconspirators, jury conviction of Mark Scott, the eight months Gilbert spent at the MCC, and the jail time that has been and will be served by coconspirators who did not immediately agree to cooperate with the Government, like Konstantin Ignatov, Mark Scott, and Sebastian Greenwood, send a clear message to potential offenders.  There is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514 (internal citation omitted); *see also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J. dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no deterrence for white collar crimes.").  These events coupled with the extensive international news coverage on the downfall of OneCoin and its leadership and similar fates faced by participants in other Ponzi schemes are together making the consequences known to those who may breach investor trust.  An additional term of incarceration for Gilbert will not move the needle any further.

Finally, with respect to just punishment, Gilbert has been and will continue to be punished for his egregious conduct in this case.  Gilbert has accepted responsibility for his actions and will continue to live with the consequences—personal and collateral—of his conduct, including his time at MCC, his loss of career opportunities and reputation, and the impact to his children and spouse noted above.  These are intensely personal forms of punishment.  Accordingly, the Court may properly consider these collateral consequences in assessing the need for just punishment under § 3553(a)(2).  *See United States v. Pauley*, 511 F.3d

468, 474-75 (4th Cir. 2007) (affirming district court's reduced sentence based in part on defendant's loss of his teaching certificate and state pension as a result of his conduct).

In light of Gilbert's significant cooperation, the collateral consequences of his criminal conviction, and his incarceration under the harshest of conditions, a sentence of time served provides just punishment for Gilbert's offenses and acts as a powerful deterrent to Gilbert and to society as a whole.  *See, e.g.*, Sentencing Tr. at 27-28, *United States v. Bahn*, 16 CR 831 (ER) (S.D.N.Y. Sept. 6, 2018) (ECF No. 80) (imposing a sentence of six months, which was substantially below the calculated guidelines range of 70 to 87 months, after considering defendant's non-5K cooperation, the collateral consequences of his conviction, and the need to afford adequate specific and general deterrence); Sentencing Tr. at 50-51, *United States v. Baron*, 18 CR 00102 (KAM) (E.D.N.Y. Jan. 24, 2019) (ECF No. 80) (imposing sentence of time served based on defendant's age, health conditions, lack of criminal history, and the harsh conditions endured during pre-trial confinement).

## VI.   The Government Has Not Established an Adequate Basis for Restitution

### A.   Restitution

According to the PSR, the Government is seeking restitution from Gilbert under the Mandatory Victims Restitution Act of 1996 ("MVRA") in an unidentified amount.  (*See* PSR ¶ 59.)  To date, the Government has not supplied additional information about the identity of any victims or the amount of restitution it is seeking on behalf of those victims.  As such, there is no basis to grant restitution.

Pursuant to 18 U.S.C. § 3663A(a)(1), the Court is to order that "the defendant make restitution to the victim of" a specified offense.  A "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any

person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).

The MVRA applies only where an "an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), and "a court's power to order restitution is limited to actual loss," *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000). Accordingly, the Government may seek restitution "only for an amount of loss caused by the specific conduct forming the basis for the offense of conviction."  *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994).

The Court may not order restitution to unidentified victims.  *See United States v. Catoggio*, 326 F.3d 323, 328-29 (2d Cir. 2003) (holding that "[t]he MVRA is clear that restitution can only be imposed to the extent that the victims of a crime are actually identified," that "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain, the district court should identify the victims and their actual losses prior to imposing restitution under the MVRA," and accordingly, the district court "err[ed] in ordering restitution to unidentified, as opposed to unidentifiable, victims and in an amount ($80 million) that may not represent the actual losses to those victims").  "Ultimately, if the court finds that 'complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process,' then the court may, in the exercise of its sound discretion, decide not to order restitution at all."  *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012) (quoting 18 U.S.C. § 3663A(c)(3)(B) and citing USSG § 5E1.1(b)(2)).

The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence.  18 U.S.C. § 3664(e).  We respectfully submit that the Government has not satisfied its burden.  The Government has not identified more than a handful of the purported millions of victims of the entire OneCoin Scheme, let alone specified the amounts each of these victims is owed or how those amounts could feasibly be returned to each individual victim.

Moreover, given the international scope of the OneCoin Scheme, the purported several million investors, and the lack of reliable investor records, the burden of calculating the cause and amount of any identified victims' losses would complicate or prolong the sentencing process to such an extent that the burden on the sentencing process would outweigh the need to provide restitution to any victim.  U.S.S.G. § 5E1.1(b)(2).  Under similar circumstances, courts in the Second Circuit have denied requests for restitution.  *See, e.g.*, *United States v. Adorno*, 950 F. Supp. 2d 426, 431 (E.D.N.Y. 2013).

In sum, the PSR fails to identify any victims or their actual loss amounts.  As such, Gilbert should not be assessed a restitution penalty.

### B.    Forfeiture

As noted earlier, Gilbert has already secured more than $40 million for forfeiture to the Government, and has agreed to forfeit interests in two properties each worth millions more.  We are hopeful that we will reach a resolution with the Government on a proposed restitution order to present to the Court at sentencing.

### <u>CONCLUSION</u>

In its opposition to Gilbert Armenta's bail motion in light of COVID-19, the Government argued that "[g]iven that the defendant has now experienced a custodial term and in light of the fact that he now faces the prospect of an applicable 100-year Guideline sentence . . . the

defendant has every incentive to flee in order to avoid further imprisonment."[15]  The Government was wrong about that—Gilbert instead remained by his family's side so that he could take responsibility for the charges laid out in the Information, as he always has, put himself at the mercy of the Court, and move forward from this horrific chapter of his life.  However, the Government was right about one thing—eight months in the MCC can change a person, and it has irreparably changed Gilbert.  Between the rats, the violence, the threats, the drugs, ███████, the contraction of COVID-19, the lockdowns, the solitary confinement, and the time away from his family, Gilbert will never take his freedom for granted again.  He will be the first to admit that he deserved to be punished for his wrongdoings—and he has been, gravely.

Gilbert is truly remorseful for the conduct that has brought him before this Court and realizes the harm that his actions have caused.  He is ashamed of the way that he acted and is committed to living the remainder of his life as an honorable and productive person.  Through his 35 years of sobriety, Gilbert has demonstrated that he is capable of total rehabilitation, and he is asking this Court for the opportunity to do it again.

---

15.  Response to Bail Motion at 8, *USA v. Armenta*, No. 17-CR-556 (ER) (S.D.N.Y. Mar. 20, 2020).

For these reasons, Gilbert respectfully requests that the Court exercise leniency in sentencing him to time served.

Dated:  January 27, 2023
        New York, New York

                                Respectfully submitted,
                                HUGHES HUBBARD & REED LLP

                                By:   /s/ Marc A. Weinstein
                                    Marc A. Weinstein
                                    Kiran H. Rosenkilde
                                    One Battery Park Plaza
                                    New York, New York 10004
                                    Telephone:  (212) 837-6000
                                    Facsimile:  (212) 422-4726
                                    Email:  marc.weinstein@hugheshubbard.com
                                            kiran.rosenkilde@hugheshubbard.com

                                *Attorneys for Defendant Gilbert Armenta*

68