

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 10, 2023

**BY ECF AND EMAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Gilbert Armenta*, 17 Cr. 556 (ER)

Dear Judge Ramos:

    The Government respectfully submits this letter in connection with the sentencing of defendant Gilbert Armenta ("Armenta" or the "defendant'), scheduled for Thursday, February 16, 2023, at 11:00 AM. Under the circumstances of this case—including the defendant's participation in a global $4 billion fraud scheme and in an extortion scheme targeting and threatening another money launderer and his family, his extraordinary assistance to the Government in its investigation, and his decision to violate his cooperation agreement by participating in separate and new crimes—the Government believes that a reasonable sentence can be found in a term of imprisonment after a significant downward variance from the Guidelines recommendation, along with forfeiture.

    The Government does not make this determination lightly. The U.S. Sentencing Guidelines call for a sentence of 100 years' imprisonment, due to the severe nature of the defendant's crimes. Other factors call for a significant downward variance, primarily the defendant's extensive historical and proactive cooperation efforts over the course of nearly two years. Those efforts were significantly blunted, however, when the defendant chose on multiple occasions over time to violate his cooperation agreement and engage in a series of separate and serious crimes that impacted the Government's prosecutive efforts, made it impossible for the Government to credibly call him to the stand at any trial of this matter, and caused the Government to decide not to provide him with a letter pursuant to Section 5K1.1.

    For its part, the Probation Office has properly found that the defendant's crimes were "far reaching throughout the world, involved significant and substantial planning and execution, and was done entirely for personal gain…. [and that] some victims of the scheme lost their life savings." (PSR at 47-48). Moreover, it concluded that "the defendant has shown that he can be a violent offender or at the very least, he can threaten violence." (PSR at 48). Taking all the appropriate factors into account, the Probation Office concludes that a significant discount from the Guidelines is warranted, and recommends a 91% downward variance with a sentence of nine years' imprisonment.

For the reasons that follow, the Government agrees with the Probation Office's considered view that a downward variance is appropriate under the applicable factors, and also that a sentence of imprisonment is appropriate. (*See. e.g.*, PSR at 49). Specifically, while the Government respects Probation's view that nine years' imprisonment is warranted, the Government submits that a lower sentence of seven years' imprisonment would also be appropriate, and that any sentence of less than five years' imprisonment would not.

## **Background**

### I.      **Procedural History of Armenta's Case**

In September 2017, Armenta was charged and arrested on a sealed three-count indictment, 17 Cr. 556 (the "Indictment"), with extortion-related offenses. He provided a post-arrest statement to agents, and expressed his interest in cooperating with the Government. He subsequently attended a series of proffer sessions, during which he provided extensive information about his own criminal activity and the criminal conduct of others. In late September 2017, he was permitted to return to Florida, to reside at his home there, as he continued efforts to cooperate with the Government.

In January 2018, Armenta pled guilty pursuant to a cooperation agreement to a five-count superseding information, S1 17 Cr. 556 (the "Information"). The charges in the Information carry a statutory maximum sentence of 100 years' imprisonment.

Over the next year-and-a-half, Armenta provided extraordinary historical and proactive cooperation to the Government. However, after the Government became aware of serious violations of his cooperation agreement, in July 2019, he was remanded into custody at the Government's request. In December 2019, the Government informed Armenta that it would not be providing a Section 5K1.1 letter in connection with his sentencing.

Armenta remained in custody at the Metropolitan Correctional Center ("MCC") from July 2019 until March 2020, including during the early stage of the COVID-19 pandemic. He has been on home detention since March 2020.

### II.     **Armenta's Offense Conduct**

The conduct underlying the counts of conviction is, by any measure, incredibly serious. Notably, the Government possessed sufficient evidence to charge Armenta with the OneCoin-related conduct described below (as charged in Counts One, Two, and Five of the Information), but initially chose to seek the Indictment only with respect to the extortion scheme now charged in Count Five for reasons related to the ongoing investigation at the time of the filing of the Indictment. (*See* Dkt. 17 Cr. 556, Doc. No. 4). On the other hand, at the time of Armenta's arrest in September 2017, the Government was not aware of the Mexican bribery scheme or the laundering of illegal gambling proceeds charged in Counts Three and Four of the Information, respectively. The Government only learned about that conduct as a result of Armenta's voluntary disclosure during his post-arrest proffer meetings.

A. The OneCoin Fraud Scheme (Counts One, Two, and Five)

1. *Background on OneCoin*

OneCoin Ltd. ("OneCoin") was co-founded in 2014 by Ruja Ignatova and Sebastian Greenwood, and was based in Sofia, Bulgaria. (PSR ¶ 18). OneCoin marketed and sold a fraudulent cryptocurrency by the same name. (PSR ¶ 17). OneCoin began operating in the United States in or around 2015. Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from its victims.[1] As described in further detail below, Armenta played a critical role in laundering over $300 million of OneCoin fraud proceeds, and also assisted Ignatova in, among other things, setting up bank accounts to receive victim funds.

OneCoin marketed its fake cryptocurrency through a global multi-level marketing ("MLM") network of OneCoin members. It claimed to have over three million members worldwide, including victims living and/or working in the Southern District of New York. OneCoin promoted various "trader packages" priced at, for example, €100 and €55,400. Purchase of a trader package provided access to "educational materials" and "tokens." (PSR ¶¶ 18-19).

In reality, OneCoin was a massive fraud, based on a fake cryptocurrency and timed perfectly to capitalize on the notoriety of Bitcoin. Indeed, Ignatova herself routinely claimed to members that OneCoin would be the "Bitcoin killer." Meanwhile, even before OneCoin went live, she discussed an "exit strategy" with her co-founder, Greenwood; the first option she listed was "Take the money and run and blame someone else for this…" (PSR ¶ 21). The misrepresentations made to OneCoin investors were legion, and the cryptocurrency was worthless.

Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact OneCoin itself arbitrarily set the value of the coin, without regard to market forces. (PSR ¶ 20). The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. (PSR ¶ 19). Unsurprisingly, it never decreased in value.

OneCoin also lied to investors about the utility of the tokens included in trader packages, claiming that they could be used to secure positions in OneCoin's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins. (PSR ¶ 19). But there were no mining pools, and no computers either.

---

[1] OneCoin records obtained subsequent to the issuance of the PSR in this case contain revenue and "profit" figures through the end of 2016, as opposed to the end of the third quarter of 2016. (*See* PSR ¶ 22). According to those records, between the fourth quarter of 2014 and the fourth quarter of 2016, OneCoin Ltd. generated €4.037 billion in sales revenue and earned "profits" of €2.735 billion.

OneCoin also claimed to have a private "blockchain," or a digital ledger identifying OneCoins and recording historical transactions. But, in reality, OneCoin lacked a true blockchain, that is, a public and verifiable blockchain. Indeed, by approximately March 2015, Ignatova and Greenwood had started allocating to members OneCoins that did not even exist in OneCoin's purported private blockchain, referring to these coins as "fake coins." (PSR ¶ 20).

This was not a victimless crime, far from it. People all over the world lost their hard-earned money, some to devastating effect. Linda Cohen, an SDNY victim who testified at the November 2019 trial of co-conspirator Mark Scott (the "Scott Trial"), stated that because of her lost $28,000 investment on OneCoin, she was still working at the age of 76 despite wanting to retire. (*See* Scott Trial Tr. at 809-10). William Horn, another OneCoin victim who took the stand at the Scott Trial, testified that he took $20,000 from his daughter's educational fund, and sold a necklace, an old pickup truck, and a generator to finance nearly $30,000 in OneCoin investments, only to lose it all; even more, he unwittingly induced close family members to invest in OneCoin as well—"the ones that could ill afford to lose the money"–and they never again saw a dime of those funds. (*See* Scott Trial Tr. at 79, 89-91, 94, 97). A BBC podcast that explored the global reach of the scheme, The Missing Cryptoqueen, included an interview of a victim in Uganda who sold off his most valuable possessions, three goats, in order in invest in worthless OneCoin.[2] In short, OneCoin's billions were earned off the backs of those lowest on the MLM food chain.

    2.    *Armenta's Role in the OneCoin Scheme*

While Armenta never directly interacted with victims and had no role in marketing or selling OneCoin, he played an important role in facilitating the scheme. He was first introduced to Ignatova in 2015. They began dating thereafter, and remained together until she disappeared in October 2017. When Armenta first met Ignatova, she and Greenwood desperately needed help laundering OneCoin fraud proceeds. They turned to the defendant. (PSR ¶ 25).

Armenta, a United States citizen residing in Florida, used various corporate entities—including two Florida businesses that Armenta controlled, named "Zala Group" and "Fates Group"—to launder OneCoin-derived funds. Over the course of two years, between 2015 and 2017, Armenta laundered over $300 million of OneCoin proceeds through U.S. and international bank accounts. To do it, Armenta repeatedly provided false information to banks and created fake documents to conceal the true origin of the funds. He and his employees and associates claimed, among other things, that the transfers of OneCoin proceeds represented legitimate loans and investments—and in at least one case payment for a patent—and supplied fraudulent documentation to paper the transactions. (PSR ¶¶ 26, 28-29).

Armenta also introduced Ignatova to co-conspirator and law firm partner Mark Scott, who thereafter laundered another approximately $400 million in OneCoin proceeds. Armenta knew that Scott laundered money for Ignatova, and even sent $10 million of OneCoin proceeds to Scott's fake investment funds in an effort to funnel the money back to her. (PSR ¶ 27).

---

[2] *See* The Missing Cryptoqueen Podcast, Episode 8: The Technology and the Dream, available at https://www.bbc.co.uk/programmes/p07sz990, at timestamp 1:40-3:20.

Armenta's role was not limited to laundering fraud proceeds. Armenta took other important steps to help Ignatova execute the underlying fraud scheme. Among other things, he: (a) coordinated the opening of bank accounts for the purpose of receiving funds from OneCoin victims; (b) established and administered OneCoin "pool accounts" at various international banks, which were used to aggregate OneCoin victim funds; (c) introduced Ignatova to an online reputation company for the purpose of removing from the Internet negative information about OneCoin; and (d) used a bank that he acquired in the country of Georgia (the "Georgian Bank") to issue OneCoin-related payments, including recruitment commissions to OneCoin members who recruited new victims and refunds to dissatisfied OneCoin members. (PSR ¶¶ 30-31).

Importantly, Armenta knew early on about the deception, victimization, and plight of OneCoin investors. After OneCoin listed one of Armenta's bank accounts in Florida in wiring instructions for investor-victims, an online article appeared in December 2015 linking his office address to the scheme.[3] Shortly thereafter, disgruntled OneCoin investors appeared in person at the Florida office. Armenta nonetheless continued laundering hundreds of millions of dollars in fraud proceeds.

Armenta's involvement in OneCoin funded his lavish lifestyle. He purchased his own private jet (the "Private Jet") at a cost of over $3 million. He bought a luxury oceanside property in Fort Lauderdale, Florida for $3.7 million ("Fort Lauderdale Property-1"). He wore designer clothing and luxury watches. He rented luxury cars. (*See* Scott Trial Tr. at 898-99) (bank witness testifying that during a visit to a local Florida bank branch, Armenta wore a designer Salvatore Ferragamo shirt, sported a Patek Phillipe or Elonge & Suna luxury watch, and drove either a Bentley or a Rolls Royce); (*see also* PSR at 29) (identifying among Armenta's monthly expenses, as reported in his financial affidavit dated April 16, 2020, vehicle lease payments for a 2014 Ferrari and a 2017 Bentley).

        3.     *Armenta's Role in the OneCoin-Related Extortion Scheme*

As noted above, Armenta was not OneCoin's only money launderer. Among others, a U.K. national named Christopher Hamilton worked with Armenta to launder fraud proceeds through his British entity, Viola Asset Management ("VAM"). Between October 2015 and February 2016, Armenta transferred approximately $60 million in OneCoin fraud proceeds to VAM accounts in the U.K., for the purpose of laundering the funds. In February 2016, Hamilton also began helping Armenta to launder an additional $39 million of OneCoin proceeds out of China through Hong Kong. Not long thereafter, Hamilton stole $32 million of that money. (PSR ¶¶ 32-35).

Armenta sought to avenge that theft, and quickly orchestrated an extortion scheme. He hired so-called "debt-collectors" in the U.K. and made clear that he was willing to authorize the use of force and threats of violence to collect payment from Hamilton. During one recorded meeting in August 2017, Armenta said that he had people watching Hamilton "every day," that he had pictures of Hamilton's daughter, wife, and Hamilton himself, and that Hamilton was

---

[3] *See* https://behindmlm.com/companies/onecoin/onecoin-change-banks-again-now-using-a-us-bank/.

"under surveillance." He went on to say, "So all we have to do is figure out where he is, etc., etc. Nobody will kill him, but they'll make him wish he was dead." (PSR ¶¶ 36-37).

Approximately one week after that meeting, Hamilton made a police report to the South Wales Police. Two men, both unknown to him, visited Hamilton at his home and directed him to return the stolen funds. Following the meeting, Hamilton received a series of WhatsApp messages containing threats and surveillance photographs of Hamilton's wife and children. The messages urged Hamilton to return the $32 million in stolen funds or face serious consequences. (PSR ¶ 38).

      B.      <u>Bribery of Mexican Government Official and Laundering of Illegal Gambling Proceeds (Counts Three and Four)</u>

As part of his post-arrest proffers, Armenta disclosed to the Government other criminal conduct pre-dating the OneCoin scheme. First, in early 2014, Armenta made a payment of over $250,000 to an intermediary in Mexico, understanding that some or all of the funds would be paid to a government official. Armenta made the payment in an effort to secure a lucrative government contract. Until his arrest in September 2017, Armenta hoped to win the contract and move forward with related work sometime in 2018. (PSR ¶¶ 40-41).

Second, between 2015 and 2017, using accounts at the Georgian Bank that he controlled, Armenta laundered a total of approximately $25-$30 million of illegal gambling payments. Specifically, he miscoded credit card transactions that involved illegal online gambling payments, in order to conceal the true underlying merchant and purpose of the payments. Miscoding was necessary to avoid illegal gambling payments being flagged or rejected by United States financial institutions. The miscoded transactions would appear to financial institutions to relate to innocuous (and in fact, non-existent) merchants. Armenta earned substantial fees for his role in laundering these funds. (PSR ¶¶ 42-45).

### III. Armenta's Extraordinary Cooperation Efforts

As detailed in the defense submission, both before entering his cooperation agreement, and in the year-and-a-half following his guilty plea, Armenta provided substantial historical and proactive cooperation to the Government.[4] The Government will not recount in detail the

---

[4] This letter references certain non-public aspects of the defendant's cooperation, and the Government therefore respectfully requests permission to file portions of this letter under seal. This Court's individual rules expressly allow the redaction of "information regarding an individual's cooperation with the government" without application to the Court, and, although there is a qualified right of public access to court documents, the Second Circuit and District Courts therein have recognized that certain circumstances may warrant the delayed docketing or filing of documents under seal to protect the safety of cooperating defendants and their families. *See United States v. Longueiul*, 567 Fed. App'x 13 (2d Cir. 2014) (summary order) (affirming district court sealing of documents "as they reflected sensitive information about cooperating witnesses"); *United States v. Cojab*, 996 F.2d 1404, 1407-09 (2d Cir. 1993) (affirming sealing order); *United States v. Haller*, 837 F.2d 84, 88 (2d Cir. 1988) (affirming decision to seal that

innumerable efforts Armenta made to cooperate, both against OneCoin targets and many others for conduct completely separate from the OneCoin fraud, as the defendant has ably catalogued those efforts in his own submission. (*See* Def. Mem. at 25-37). To be clear, the Government does not dispute the defendant's lengthy recitation of his cooperation efforts, nor the characterization that they were extraordinary, valuable, and extensive.

Some non-exhaustive highlights of Armenta's extensive cooperation follow. He made himself completely available to his handling agents. He participated in countless proffer meetings during which he shared historical and current information on OneCoin targets and other criminal actors. He participated in well over a hundred consensually recorded calls and meetings, including many calls with Ignatova—one of the founders and operators of the OneCoin scheme, who was eventually added to the FBI's Top Ten Most Wanted Fugitives list (see https://www.fbi.gov/wanted/topten/ruja-ignatova). Indeed, several recorded calls placed by Armenta to Ignatova were admitted as exhibits at the Scott Trial. He shared with agents documents he obtained through his proactive cooperation on a real time basis. He consented to the search of his email accounts and electronic devices. He waived attorney-client privilege, removing a significant barrier to the review of certain content within those accounts and devices, and reducing the complexity of production of materials in discovery to co-defendants. He doggedly pursued and achieved the return to the Government of over $40 million dollars of OneCoin proceeds from the United Kingdom, which he had previously been involved in laundering. Even after he was told he would be remanded to custody for his serious cooperation agreement violations, ███████████████████████████████████████████ and following his remand, continued providing assistance to the Government in various ways.

As described below, after Armenta committed flagrant violations of his cooperation agreement, the Government determined, among other things, that he could not be called as a witness at trial. Nonetheless, his cooperation produced tangible results. The information provided by Armenta, and the consensual recordings and other evidence gathered by Armenta during the investigation, assisted the Government in bringing charges against Mark Scott and numerous other OneCoin targets. His cooperation also provided context and insight into the OneCoin scheme and those involved, and helped guide the Government in its view of the evidence.

Finally, Armenta's cooperation with the Government was not without risk to himself and his family. Evidence introduced at the Scott Trial established that Ignatova bugged Armenta's home in Florida and listened to his private conversations with his wife. Ignatova also hired spies to befriend Armenta and his wife to gather additional information about him. While the Government has no evidence that Ignatova engaged in this spying with an intent to harm Armenta, and likewise has no evidence that the individuals who used violence and threats of

---

portion of a plea agreement that referred to a defendant's ongoing cooperation); *United States v. Loera*, No. 09 Cr. 466 (BMC), 2018 WL 5906846, at *1 (E.D.N.Y. Nov. 11, 2018) (finding that sealing was justified, in part, because "[t]he families of both cooperating witnesses will also face significant safety risks once the fact of these witnesses' cooperation becomes public"). The Government is submitting an unredacted version of this letter to the Court this evening, and will file a redacted version of this letter on the docket prior to sentencing.

violence against Konstantin Ignatov have any connection to Armenta or to the United States, there is no doubt that Armenta exposed himself to a risk of harm as a result of his cooperation with the Government.

### IV.    Armenta's Flagrant Violations of His Cooperation Agreement

Just as Armenta made extraordinary efforts at cooperation, he violated his cooperation agreement in extraordinary ways, through blatant dishonesty and the commission of egregious additional crimes. He admitted that he hid all of this conduct from the Government, despite the fact that he was obligated under his cooperation agreement to, among other things, "truthfully and completely disclose all information with respect to the activities of himself and others" and "commit no further crimes whatsoever." Just as his cooperation greatly aided the Government's investigation and prosecution, these violations harmed the Government's prosecutive efforts. And they led the Government to seek Armenta's remand in July 2019, and to inform him in December 2019 that he would not be receiving a Section 5K1.1 letter.

#### A.    Armenta's Surreptitious Sale of the Private Jet

Prior to his entry into a cooperation agreement, the Government determined that Armenta had purchased the Private Jet using dirty funds he earned from laundering OneCoin fraud proceeds. Accordingly, following Armenta's arrest in September 2017, the Government prohibited Armenta from flying the Private Jet, except for routine maintenance flights, as approved by the Government. While no written forfeiture agreement or order existed regarding the Private Jet, due to the likelihood that some or all of any future sale proceeds would be forfeitable to the Government, the Government made clear that it would need to be involved with, and pre-approve, the terms of any sale of the Private Jet and the disposition of any sale proceeds.

On January 18, 2019, the Government was notified that the Private Jet was en route to the Bahamas. Although the Government had recently approved a maintenance flight for the Private Jet, the movement of the airplane appeared to be inconsistent with a routine maintenance run. After receiving the January 18, 2019 notification, the Government immediately contacted Armenta's counsel and requested an explanation for the movements of the Private Jet. Armenta's counsel indicated that a prospective buyer was flying the Private Jet on a test run, but that Armenta did not know that the Private Jet would be flying out of the country. The Government then informed counsel that: (i) the Private Jet should be flown back to the United States immediately, not to be flown again until such time as approved by the Government; and (ii) that Armenta should immediately cease efforts to sell the Private Jet. Counsel responded to the Government's request by indicating that Armenta would make his best efforts to return the Private Jet to the United States, but that such efforts were not fully in his control.

In a subsequent telephone call on January 22, 2019, between the Government and Armenta's counsel, counsel informed the Government that Armenta had: (i) filed two liens against the Private Jet; (ii) on September 4, 2018, secured a $1.2 million loan against the Private Jet; and (iii) on December 28, 2018, *sold* the Private Jet for a purchase price of $2.2 million, of which $1.2 million represented the repayment of loan made to Armenta by the purchaser.

Armenta later admitted in a proffer session with the Government that he had lied to his counsel, and thereby to the Government, about the sale of the Private Jet in December 2018.

As a result of this conduct, the Government could have decided to terminate Armenta's cooperation, but did not do so. Instead, in March 2019, the Government requested a modification to his bail conditions. The Government sought and obtained, with the defendant's consent, new conditions disallowing any international travel, tightly restricting domestic travel, and imposing a daily curfew enforced by a voice verification monitoring system.

In short, the Government gave Armenta a second chance. Rather than tightening his compliance with the terms of his agreement, however, he doubled down and engaged in much more serious criminal conduct.

B.   Armenta's Fraudulent Negotiation of a $5 Million Treasury Check

In or about the beginning of July 2019, the Government first learned from an independent source that in April 2019—after Armenta had deceived the Government with respect to his sale of the Private Jet—Armenta was involved in the unlawful negotiation of a $5 million U.S. Treasury refund check (the Check"). The Check was made out to a Japanese national (the "Japanese National"), whom Armenta did not know. Armenta arranged for an employee of his company to deposit the Check into an account that the employee opened in the name of the Japanese National, as a purported power of attorney for the Japanese National (the "Depository Account"). Within three weeks of the Check's deposit into the Depository Account, the vast majority of the funds were transferred out of the account to accounts controlled by Armenta, as well as to an acquaintance of Armenta's.



Armenta used the remainder of the Check proceeds for himself and to fund his company's operations. Notably, he used $450,000 of the Check proceeds as a down payment for the purchase of a second luxury property in Fort Lauderdale for $2.65 million ("Fort Lauderdale Property-2"). He layered the $450,000 through a series of bank accounts, in an apparent effort to hide its illegal source. He then submitted a fake invoice and fake check for $500,000 from the Japanese National (whom he had never met) to the mortgage provider/bank, falsely making it appear that he had received the funds legitimately and directly from the Japanese National.

Armenta ultimately admitted to the Government—but only after being confronted—that: (i) Armenta understood that the Check was dirty; (ii) Armenta disregarded numerous red flags around the Check and decided to cash it anyway; (iii) Armenta was promised 20% of the Check proceeds in exchanging for cashing the Check by the individual who provided him with the Check;

and (iv) once he deposited the Check, Armenta decided not to pay any of the proceeds to the individual who provided him with the Check, and instead kept 100% of the Check proceeds.



D.     <u>Consequences of Armenta's Egregious Cooperation Agreement Violations</u>

The consequences of Armenta's post-plea criminal conduct extended well beyond the Government's decisions in July 2019 to seek his remand, and in December 2019 to inform him that the Government would not file a letter pursuant to U.S.S.G. § 5K1.1 on his behalf. Critically, the Government had viewed Armenta as a principal witness—if not the principal witness—in its trial strategy related to the prosecution of co-conspirator Mark Scott. In light of Armenta's egregious violations of his cooperation agreement, however, the Government ultimately determined that it could not call him to testify at that trial. While the Government was able to present a powerful case against Scott and proved his guilt far beyond a reasonable doubt, there is no question that Armenta's conduct frustrated the Government's efforts.

The defendant's breach and continued commission of crimes must be weighed heavily against the defendant's extensive cooperation efforts, such that others who have entered or are considering entering cooperation agreements with the Government will be sufficiently deterred from the commission of future breaches and understand that doing so carries consequences, even in the face of valuable cooperation. In this regard, when the Government enters into a cooperation agreement, it invests substantial time and effort, and depends in part and relies on the cooperator's promises and availability to testify at trial. The grave violations that Armenta

---



committed in the run-up to the Scott Trial—serious enough to warrant separate federal charges in their own right—destroyed his credibility and rendered him unable to testify. Such violations can and sometimes do undermine entire prosecutions, wasting limited law enforcement and court resources and resulting in a miscarriage of justice. Here, as noted above, the Government was able to mount a strong trial case against Scott notwithstanding Armenta's breaches, but there is no doubt that Armenta's violations negatively impacted the Government's efforts in the wide-ranging OneCoin prosecution.

## Discussion

### I.  The Applicable Guidelines Range

The parties largely agree on the application of the U.S. Sentencing Guidelines in this case, including the applicable loss amount of over $550 million. However, the defendant opposes the application of three Guidelines enhancements under Sections 2B1.1 and 3B1.1. These arguments are meritless and should be rejected.

First, Armenta claims that a six-level victim-related enhancement pursuant to Section 2B1.1(b)(2)(C) should not apply. It does. As noted above, Armenta was well aware that the scheme was causing substantial financial hardship to more than 25 victims. As a threshold matter, he knew, not long after meeting Ignatova in 2015, that OneCoin was a massive fraud scheme. Indeed, in December 2015, after an online article linked his bank account and Florida office address to OneCoin, disgruntled victims turned up at his office to complain. Because he set up bank accounts to receive and pool victim investments, he was aware of the size of individual transfers and the scope of the scheme. He personally laundered over $300 million of the fraud proceeds. And as Ignatova's romantic partner, he was substantially more aware than outsiders about how the scheme operated; a scheme that involved more than more $4 billion in victim contributions, and as many as three million victims. Accordingly, there can be little doubt—particularly on a preponderance standard—that it was reasonably foreseeable to Armenta that the OneCoin fraud scheme involved substantial financial hardship to at least 25 people. (*See also* PSR ¶ 48). The enhancement is properly applied.[6]

---

[6] Armenta also argues that "foreign victims of a foreign fraud should not be considered for purposes of applying the enhancement in Section 2B1.1(b)(2)(C)." (Def. Mem. at 47). As a threshold matter, OneCoin was not a "foreign fraud." It involved interstate and international wires to and from the U.S., and countless U.S. victims. As the Government will argue in much further detail in a brief to be filed on February 15, 2023, in connection with Sebastian Greenwood's sentencing, the enhancements set forth in Section 2B1.1 are properly premised upon all of the conduct undertaken as part of the charged OneCoin wire fraud and money laundering offenses. Moreover, as demonstrated by the testimony of OneCoin victim William Horn at the Scott Trial regarding large OneCoin events (*see* Scott Trial Tr. at 70-71), and other evidence showing that nearly $60 million was invested into OneCoin by U.S. investors, there is sufficient evidence upon which to apply this enhancement based on U.S. victims alone.

With respect to the footnotes in Armenta's submission suggesting that loss should also be cabined to loss suffered by U.S. OneCoin victims (*see* Def. Mem. at 47, n.12, and 50, n.13), that

Second, Armenta claims that the two-level sophisticated means enhancement pursuant to Section 2B1.1(b)(10)(C) is inapplicable to him. That argument is meritless. As noted above, Armenta took a series of sophisticated steps—putting aside his involvement in the very sophisticated laundering of OneCoin proceeds—to facilitate the underlying OneCoin fraud scheme. He coordinated the opening of accounts at banks in Mexico and South America for the purpose of receiving funds from OneCoin victims. He established and administered OneCoin "pool accounts" at various international banks, which were used to aggregate OneCoin victim funds. He introduced Ignatova to an online reputation company for the purpose of removing from the Internet negative information about OneCoin. And he used the Georgian Bank, which he controlled, to issue OneCoin-related debit card payments, including recruitment commissions to OneCoin members who recruited new victims and refunds to dissatisfied OneCoin members. (PSR ¶¶ 30-31). This enhancement is properly applied.

Third and finally, Armenta claims that the three-level leadership enhancement pursuant to Section 3B1.1(b) does not apply in this case. The defendant's position on his leadership role elides the facts of the case, as set forth in the PSR. Armenta posits that, "[i]n the context of this case, which is premised on the OneCoin fraud scheme, the defense does not believe an aggravating role enhancement is appropriate or necessary." (Def. Mem. at 55). The argument ignores the fact that Armenta controlled and ran several companies through which he laundered over $300 million in OneCoin proceeds, and that he employed more than five people to facilitate those money laundering efforts. (PSR ¶¶ 30-31). The three-level leadership enhancement under Section 3B1.1(b) for serving as a manager or supervisor of criminal activity involving five or more participants clearly applies here.

In short, the total offense level of 43 calculated in the PSR is accurate, as is the resulting Guidelines sentence of 100 years' imprisonment.

## II.     The Appropriate Sentence

As set forth above, Armenta's offense conduct included the laundering of over $300 million of fraud proceeds, his facilitation of the underlying OneCoin fraud scheme, and his orchestration of an extortion scheme involving serious threats of violence. And while his cooperation efforts were extraordinary, his breaches were as well, jeopardizing the Government's prosecutive efforts and representing serious criminal offenses in their own right. Accordingly, a sentence of seven years' imprisonment would be appropriate in this case, and any sentence of less than five years' imprisonment would not.

---

issue need not be resolved by the Court, as there in no dispute between the parties in the case that the total loss amount exceeds $550 million.

Finally, the defendant is incorrect that the "amount of laundering was less than $550,000,000." (Def. Mem. at 50, n.13). In addition to the $300 million that Armenta personally laundered for OneCoin, the additional $400 million laundered by Mark Scott for OneCoin was reasonably foreseeable to the defendant, given that it was Armenta who introduced Scott to Ignatova, that Armenta became aware that Scott was laundering OneCoin proceeds through Scott's fraudulent investment funds, and that Armenta himself transferred $10 million of OneCoin proceeds into Scott's fraudulent investment funds at Ignatova's direction. (PSR ¶ 27).

      A.      <u>Seriousness of the Offense and Need for Just Punishment</u>

The Government's recommended term of imprisonment would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

Armenta's offense conduct is, by any measure, incredibly serious. He lied to banks, provided false documents to paper transactions, and used a foreign bank he controlled to launder a massive amount of fraud proceeds. That money was stolen not from large institutional investors, but millions of individual victims who had everything to lose. And Armenta's involvement was far from brief; his OneCoin-related crimes spanned two full years, from 2015 until 2017, when he was arrested in this case. As the Probation Office observed in the PSR, "Armenta's actions did not take place over a short period of time or a 'one off' transaction as he continually and consistently laundered money and reaped the benefits of his actions while some victims of the scheme lost their life savings." (PSR at 47-48).

Armenta did it out of greed. For access to a private plane, luxury goods, and a lifestyle out of reach for the vast majority, let alone the victims of the scheme. He was not removed from the fraud. He dated one of the two founders and leaders of the scheme, and helped her with key components of the fraud, including the opening of international bank accounts to receive victim investments. He knew that people were being victimized, and chose not to stop.

Armenta's crimes were not limited to financial offenses. When his co-conspirators dared to steal from him, he resorted to extortion. He had no qualms about using threats and even potential violence to collect debts. Young children quickly wound up in the sights of the "debt collectors" he hired.

When he was arrested, as the first defendant in a massive fraud case, he was presented with a unique opportunity. He took it, and he delivered. His cooperation with the Government was extraordinary. He produced real and tangible results, and his information and evidence led to the charging of incredibly culpable co-conspirators in the OneCoin case. He was on the path to earn a gleaming 5K1.1 letter.

But ultimately, he did not live up to the agreement he entered into, far from it. His violations were blatant and egregious. After his secret sale of the Private Jet, and his lies after the fact, he was given a second chance, an opportunity to course correct. He thumbed his nose. He doubled down. And he committed more breaches, breaches that standing alone represent serious federal crimes. He took steps to hide those crimes from the Government, and only admitted to them when confronted with evidence of his deceit.

Even taking into account his extraordinary efforts at cooperation—considering his offense conduct and how he intentionally violated the terms of his agreement and jeopardized the Government's prosecution—Armenta's crimes and his breaches require substantial punishment.

  B.  General and Specific Deterrence

  The Government's recommended term of imprisonment is also necessary to protect the public, adequately deter Armenta from committing further crimes, and to deter other sophisticated and calculating criminals from similar criminal conduct. 18 U.S.C. § 3553(a)(2)(B).

  The nature and timeline of the defendant's conduct in this case clearly illustrates the need for specific deterrence and protection of the public from further crimes by the defendant. Armenta's prosecution entirely failed to deter him from additional criminal conduct. Indeed, the arrest in this case did not deter him, but appears to have emboldened him to commit serious additional crimes—fraudulently negotiating a $5 million Treasury check, committing bank fraud to purchase a multi-million-dollar property, ████████████████████████████ ████████. A substantial sentence is needed to deter Armenta from committing further offenses in the future.

  With respect to general deterrence, it is critical to send a clear message to white collar offenders—whose conduct is sophisticated and difficult to detect and whose reach is often global—that substantial financial crimes will be punished seriously.

  This is particularly true when it comes to defendants—such as Armenta—who choose to commit such crimes while under the terms of a cooperation agreement. And doubly so for defendants—such as Armenta—who choose to commit multiple crimes while under such an agreement. It is important to signal unambiguously that cooperators who commit new and serious offenses and breach their cooperation agreements should not be given the same credit as those who earn Section 5K1.1 letters, no matter how extraordinary their cooperation efforts may be.

  C.  History and Characteristics of the Defendant

  The Court must also take into consideration the history and characteristics of the defendant, which are set forth at length in the defendant's sentencing submission (Def. Mem. at 56-58). *See* 18 U.S.C. § 3553(a)(1). The Government will not repeat them here. Although these facts are relevant to the Court's consideration of a fair and appropriate sentence, they do not outweigh the other factors set forth above.

  The Court can and should also consider the defendant's incarceration at the MCC between July 2019 and March 2020, including during the earliest stage of the COVID-19 pandemic, and the defendant's term of home detention for the last three years.

  The Government has considered and weighed these significant personal circumstances, alongside the defendant's cooperation, his offense conduct, and the breaches of his cooperation agreement. When viewing all these factors together, the Government's recommended term of

imprisonment is sufficient, but not greater than necessary, to serve the legitimate purpose of sentencing.

### III. Restitution and Forfeiture

#### A. The Court Should Not Order Restitution, Pursuant to Section 3663A(c)(3)

Due to the difficulties that would be associated with fashioning a restitution order in this case, the Government agrees with defense counsel that the Court should not enter a restitution order against the defendant.

Title 18, United States Code, Section 3663A(c)(3) provides that restitution shall not be applied in certain types of cases such as the instant case (i.e., a fraud case), if the Court determines that:

> (A) the number of identifiable victims is so large as to make restitution impracticable; or
> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

The Government submits that both factors are met here. At the outset, there were over *three million* OneCoin investors worldwide, (PSR ¶ 18), who invested nearly $4 billion between late 2014 and 2016 alone. (PSR ¶ 22). Further, the defendant and his co-conspirators targeted OneCoin investors throughout the world. (PSR ¶ 23). Calculating investor losses would require identifying each of these millions of investors and determining how much they each invested. Although a small subset of investors have come forward and identified themselves to the Government, the vast majority have not. Moreover, obtaining this information would be even more difficult in this case given the passage of time and the absence of accurate contact information for most of the victims.

Notably, the Government remains committed to recover and return as much money to victims as it can. Specifically, the Government intends to recommend that monies forfeited from the defendant be distributed to victims, consistent with the applicable Department of Justice regulations, through the ongoing remission process. *See* 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9. For these reasons, the Government respectfully submits that it would be, as a practical matter, impossible to fashion a restitution order in this case and, in any event, the need to do so does not outweigh the complication and prolongation of the sentencing process.

Therefore, the Government respectfully requests that the Court decline to enter a restitution order.

  B. <u>The Court Should Enter a Forfeiture Order Against the Defendant</u>

  In imposing sentence on a person, such as the defendant, convicted of an offense in violation of Title 18, United States Code, Section 1956, the Court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." *Id.* at 306, 18 U.S.C. § 982. Property "involved in" a money laundering offense very clearly constitutes at least the actual funds laundered. *See In re 650 Fifth Ave and Related Props.*, 777 F. Supp. 2d 529, 570 (S.D.N.Y. 2011).

  Here, the parties agree that Armenta laundered $300 million of OneCoin scheme proceeds. Accordingly, Armenta has consented to the entry of a money judgment in that amount (the "Money Judgment") and a proposed Consent Preliminary Order of Forfeiture (the "Consent Order"). The Government currently anticipates that the Consent Order will provide for the forfeiture of Armenta's interest in Fort Lauderdale Property-1, Fort Lauderdale Property-2, the approximately $40 million that Armenta returned to the Government from the United Kingdom, and various pieces of personal property provided by Armenta to the Government. The Government further anticipates that the Consent Order will provide that, if Armenta pays $10 million towards the Money Judgment within eighteen months of the date of his sentencing, the Government will accept such payment in full satisfaction of the Money Judgment. The Government will submit the proposed Consent Order in advance of sentencing, and respectfully requests that the Court enter the Consent Order at the time of Armenta's sentencing.

## Conclusion

  The Government respectfully submits that a sentence of seven years' imprisonment would be appropriate in this case, and that any sentence of less than five years' imprisonment would not. The Government also respectfully requests that the Court enter the proposed Consent Order, which the Government will submit in advance of sentencing.

         Respectfully submitted,

         DAMIAN WILLIAMS
         United States Attorney

        By: /s/
         Christopher J. DiMase
         Nicholas Folly
         Kevin Mead
         Juliana Murray
         Assistant United States Attorneys
         (212) 637-2433 / -1060 / -2211 / -2314

Cc: Marc Weinstein, Esq.
   Kiran Rosenkilde, Esq.