N23DARMC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                          17 Cr. 556 (ER)

 5   GILBERT ARMENTA,

 6                                        Conference
                  Defendant.
 7   ------------------------------x

 8
                                         New York, N.Y.
 9                                       February 14, 2023
                                         10:00 a.m.
10

11   Before:

12                  HON. EDGARDO RAMOS,

13                                        U.S. District Judge

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KEVIN MEAD
17        Assistant United States Attorney

18   MARC WEINSTEIN
     KIRAN ROSENKILDE
19        Attorneys for Defendant

20   Also Present:

21   Matthew Lee, Inner City Press

22

23

24

25
```

1        THE DEPUTY CLERK:  In the matter of *United States v.*

2   *Armenta.*  Counsel, please state your name for the record.

3        MR. MEAD:  Good afternoon, your Honor.  AUSA Kevin

4   Mead appearing for the government.

5        MR. WEINSTEIN:  Good morning, your Honor.  Marc

6   Weinstein and Kiran Rosenkilde on behalf of Mr. Armenta.

7        THE COURT:  Good morning to you all.

8        Mr. Lee, do you want to step forward?

9        MR. LEE:  Definitely.

10        THE COURT:  Have a seat.

11        MR. LEE:  Okay.  I'm not sure where I'll --

12        THE COURT:  Sit up front.

13        MR. LEE:  Thank you.

14        THE COURT:  You're the movant.

15        MR. LEE:  Thanks a lot.  Matthew Lee, Inner City

16   Press.

17        THE COURT:  Good morning.

18        Mr. Lee, we're here at your request, as you are aware.

19   Mr. Armenta submitted a sentencing memorandum prior to this

20   week that was redacted in significant part.  I believe that

21   triggered your request for this hearing and that we discuss

22   whether it should be unredacted.

23        His counsel has I think yesterday submitted an amended

24   sentencing submission.  The redactions are substantially fewer.

25   And the government has submitted its sentencing submission,

1   which has some redactions.

2           As I read it, Mr. Mead, and correct me if I'm wrong,

3   all of the government's redaction relates to one topic.

4           Am I correct about that?

5           MR. MEAD:  That's correct, your Honor.

6           THE COURT:  You don't have to stand.  No one has to

7   stand.

8           Let me ask you, and as I'm sure you are aware, Mr. Lee

9   --

10          MR. LEE:  Sure.

11          THE COURT:  -- in my individual rules, I do have

12  various categories of information that, as a general matter, I

13  believe it is appropriate to redact.  I guess most relevant to

14  today's proceedings are an individual's cooperation with the

15  government, and an individual's medical condition and

16  diagnosis.

17          So let me ask you, do you maintain your request?

18          MR. LEE:  Very much so.

19          THE COURT:  Very well.

20          MR. LEE:  I mean, I tried to look with an open mind at

21  the somewhat unredacted memo, but I still -- I mean, I don't,

22  mean to just go on the bottom of it, but there are whole pages

23  redacted.  And I think this is kind of a unique situation.  I

24  understand if someone actually cooperates, testifies at a

25  trial, and has a 5K1 letter, I think that's one standard.

1    I think here you have someone that, as both sides seem

2  to say, violated his cooperation agreement, and yet he is

3  somehow getting the benefit.  I'll give you an example.  When

4  Konstantin Ignatova in this case testified and his plea

5  agreement was made public and he was cross-examined about it --

6  here, ironically, you have a situation where violating the

7  cooperation agreement, at least as I've found in the docket, I

8  haven't seen the plea agreement, and I think that in a sense

9  like the fact that Gilbert Armenta was for a time a cooperator

10  is not confidential.  Everyone knows this.

11    Right across the street, across Foley Square, I went

12  to a press conference by the FBI about their search for Ruja

13  Ignatova.  So I think, in looking at it, I don't think it's --

14  there's a public interest in knowing why the government -- I

15  think this is a matter of understanding both why the government

16  is seeking seven years, instead of the hundred years that they

17  mention in their memo is connected or is the maximum for the

18  offense conduct, and where the sentencing will come down.

19    And I think knowing -- I have no interest in the

20  medical conditions or any diseases gotten in the MDC at all,

21  but when you see whole pages -- there's even redactions right

22  after it talks about Konstantin Ignatova's plea agreement.  For

23  example, on page 29 it says, see Ignatova's plea agreement

24  dated November 27, 2019, emphasis added, and then redaction.

25  It's hard to, from the outside -- similarly, on page 26, 27.

1          I mean, I heard what you said, but sometimes it

2     speaks -- you know, a picture is worth a thousand words.  There

3     are whole sections of this that are wiped out, and I don't want

4     to be -- I feel that he was a cooperator, but he's not a

5     cooperator anymore.  And so I can imagine if there's still some

6     information that he gave that they've yet to make public or

7     they still believe they can get Ruja Ignatova, but I think part

8     of it is this was a -- the public has an interest in knowing

9     how this happened in this case, that to get so far -- quote,

10    unquote, get Mark Scott, they get two cooperation agreements,

11    one of which failed miserably, this one, and the other one --

12    and Mark Scott is still at liberty and appealing.

13         In covering this case, I know that there is a lot of

14    interest in this, and I cannot imagine that this level of

15    redaction applies.  And I notice the defense, they mention --

16    and maybe I shouldn't use the same phrase, but in the case *U.S.*

17    *v. Jen Shah*, I was also outraged by the level of redaction, but

18    I'll say that this unredacted level is still much more redacted

19    than what Judge Stein ordered in the Jen Shah case, which, you

20    know, every case is different, but I think -- and they also

21    cited the *Weigand* case in front of Judge Rakoff where he

22    unredacted the whole thing.  And I think there was one other

23    case from the government -- actually, although we're not I

24    guess contesting their redactions, because we just saw them,

25    they cited *U.S. v. Longueiul*, or something, where the parties

1  had consented to a protective order.  Here we haven't

2  consented.  This is a press request for a sentencing memo that

3  goes to I think the very heart of public understanding of

4  criminal cases and sentencing.

5       THE COURT:  Now, I just got the defense submission or

6  the amended submission, and you mentioned that Mr. Armenta --

7  it's clear and it's public that once upon a time he was

8  cooperating.  He is no longer cooperating.  The government

9  letter talks about that at some length, but you would agree,

10  would you not, Mr. Lee, that certain aspects of cooperation,

11  even if ultimately are unsuccessful, may still be sufficiently

12  sensitive and may still subject an individual to potential

13  harm, even though the cooperation ultimately was not

14  successful?

15       MR. LEE:  In the abstract, yes.  Here I think -- I

16  mean, it seems to me unless there's some -- all of it is

17  public, Hamilton, all of the things he was charged with, and I

18  think in some cases not charged with, but I think the fact that

19  Ruja Ignatova and whatever her group is knows that he

20  cooperated, I think that's totally known.  I think whatever

21  danger to him there was, whatever they could have done, they

22  would have done.  It's not like -- at least from the outside, I

23  don't think having -- you know, and some of the reporting on

24  Ruja's mindset at the time is kind of conjecture, but she was

25  very angry.

1            THE COURT:  I'm sorry?

2            MR. LEE:  She was very angry or betrayed that Gilbert

3   Armenta became a cooperator.  But I think like that was the --

4   I don't think it was -- it doesn't seem like it was her

5   understanding that he only cooperated on some matters and not

6   others, and, therefore, if it were unredacted and Ruja Ignatova

7   is alive, and if she's reading Pacer, she's going to say, now

8   I'm really mad, I'm really going to get him.  I think the horse

9   has left -- it is kind of a unique case.  It's not a case where

10  the identity of the cooperator or the extent of the cooperation

11  is not -- most of it's already public.

12           And, again, without being able to read through the

13  black lines, maybe there's some mystery behind it.  Maybe

14  there's some level of cooperation that the public doesn't know,

15  but I'm skeptical of that.  And, I mean, I guess I don't know

16  if the answer is you look at it and you, as the judge, decide

17  what should be.

18           THE COURT:  Right.

19           MR. LEE:  I guess that's the only way to go.  But I

20  don't feel self conscious saying this is too much.  Whole pages

21  for a person that the U.S. Attorney's Office gave a deal to and

22  not to be -- I cover as you rule on other cases in this

23  courthouse where people for much less money are detained for

24  long periods of time, not in the Four Seasons, and not with the

25  government's -- you know, with this inordinate -- I wonder, I

1   guess I'll go further, I think some of this is a matter of kind

2   of embarrassment.  I think the government, again, they didn't

3   know what would happen, but I think if you make two cooperation

4   deals and one flames out and one you carry through on, there's

5   even some questions about that one, and you've got only one

6   fish, maybe you want to have things blacked out.  Maybe it

7   makes sense.  But that's just me.  All I'm saying as a

8   journalist, as the press, as the press for the public, still

9   this level of redaction in this case is too much.

10          THE COURT:  Let me just ask very quickly so we can

11   take this one at a time.  I take it, Mr. Lee, that you don't

12   have any issue with the government's redactions.

13          MR. LEE:  I saw them last night.  I was a little --

14   they're much more minimal, so I've decided I don't take any --

15   just like they sometimes don't take a position, I take no

16   position on that, mostly because I just saw them and I wasn't

17   ready to ramp up.  But I feel that there's some -- I would

18   normally expect in a case where the government was -- had a

19   cooperator that, you know, not -- it wasn't a close call.  It

20   wasn't like he didn't know, he couldn't go, you know, to the

21   district of New Jersey and he went.  It was a pretty open like

22   surreptitious violation of the cooperation agreement.

23          I'm surprised at the level -- I mean, it's not my

24   decision.  It's not for me to say what their sentencing

25   recommendation should be, but I'm surprised at them sort of in

1    essence joining in the request for confidentiality.  As a

2    citizen, if not just as a journalist, I find that somewhat

3    questionable given that the person didn't come through and

4    cooperate.  But it's not a moral judgment.  I might be opposed

5    to their theory of redaction, but the individual redactions I

6    haven't looked at as closely as I might.

7          THE COURT:  Okay.  Mr. Mead, you previously confirmed

8    that all of the government's redactions related to one topic.

9    What are you prepared to state on the record about that one

10   topic?

11         Well, let me ask you, is that topic unrelated to the

12   Ignatova investigation?

13         MR. MEAD:  I want to clarify what I said earlier.

14   I've been looking through the redactions.  I think there is one

15   line on page 7 that relates to a separate topic.

16         THE COURT:  Page 7?

17         MR. MEAD:  Of the government's memo, yes, about

18   halfway through the page, just half a line that's redacted.

19         THE COURT:  Okay.

20         MR. MEAD:  The other redactions in this memo are about

21   one topic.  They're about a topic that is not connected to this

22   general investigation.  Nothing about that investigation or

23   about the defendant -- Mr. Armenta's role in it had become

24   public, and we think it's appropriate to maintain sealing as to

25   that topic, because there is a -- there is a risk to

1    Mr. Armenta if that information were to become public.

2          We don't view sealing material as a reward obviously

3    that we confer on a defendant.  We view it as something that is

4    important to their safety.  That's why we do it -- we do it in

5    cases where cooperators -- where individuals proffer with the

6    government and don't receive a 5K letter relatively routinely,

7    as well as here.  The line on page 7 does have some connection

8    to the OneCoin investigation.

9          Obviously, a great deal about the OneCoin

10   investigation has been made public over the course of the last

11   several years, but not everything has been made public.  We've

12   tried to be extremely judicious in our redactions here.  The

13   vast majority of material about that investigation are not

14   sealed in this memorandum.  That one line is sealed, because it

15   is not public, and we do believe that there is at least some

16   potential for risk based on that one line.

17         THE COURT:  Very well.  Mr. Weinstein.

18         MR. WEINSTEIN:  Yes, your Honor.

19         So one thing I just want to note with respect to the

20   government's, you know, relatively modest redactions is that

21   the government's memorandum to the Court with respect to

22   Mr. Armenta's cooperation repeated many times how extraordinary

23   and extensive it was, but essentially relied on the many

24   details that Mr. Armenta's counsel put into its sentencing

25   submission about that cooperation.  And so they don't have the

1    details in their memo that we had already put in ours, because

2    they said, look, we take literally no issue with the lengthy

3    recitation and characterization of his cooperation.  So there

4    was just simply less need I think on the government's part to

5    redact most of its submission because of the fact that the

6    details -- they didn't repeat the details.

7         With respect to Mr. Armenta's submission, you know,

8    look, it's cold comfort -- and I don't mean in anything I'm

9    going to say today to disparage the press or Mr. Lee and his

10   interest in reporting on this case, but it is certainly cold

11   comfort to hear someone from the press say that, you know,

12   there might have been a risk to his safety from, among others,

13   Ruja Ignatova a few years ago when she found out he was a

14   cooperator.  And, yes, he acknowledged how mad she apparently

15   was.

16        I don't follow these kind of blogs, so I don't know,

17   but the horse is out of the barn, so if she was going to hurt

18   him, she would have done it by now, that's a disturbing comment

19   that sort of someone might have been at a real safety risk but

20   we as a member of the press think that that has past.  I don't

21   understand how that can be.  She's on the FBI's top ten most

22   wanted list.  You don't get there by simply committing a

23   financial fraud.  You get there because the FBI believes you

24   are a danger to the community, whereever she may be.

25        There are other aspects of the cooperation that are

1  not public, and we did -- once the application was made, we

2  went back first to check the docket to see if there was any

3  public filings that even mentioned him as a cooperator, because

4  whether or not the press has reported on it is one thing,

5  whether it's ever been publicly acknowledged by the government

6  in a court filing is another thing.  So we did check, and there

7  were a few instances we found where it was -- where his

8  cooperation was identified.  So we went back, we unredacted a

9  significant portion of our original memo which really does lay

10  out a lot of detail about his cooperation.

11        I think we filed a new version Friday evening along

12  with or simultaneous really to our letter in response to Mr.

13  Lee's letter, but there are aspects -- whether you consider his

14  cooperation to have been successful or not, and I think to say

15  it wasn't is missing quite a lot of detail and nuance, but that

16  doesn't change the risks that he put himself in while he was

17  working for two years for the government.

18        There are aspects of the cooperation, proactive

19  aspects, and I think that's largely what we redacted.  So

20  proactive aspects that were never public, that haven't been

21  made public as part of the case, some of which don't involve

22  OneCoin, for which he has real safety concerns, putting aside

23  the safety concerns with Ms. Ignatova and her group.

24        And I think there are some aspects where, you know,

25  even the government I think would agree, certain efforts that

1  were taken, I don't think the government, frankly, wants to

2  make public the types of effort it made with him as part of its

3  investigation to learn facts about people or, you know, even

4  find out where they are.

5        So we were somewhat judicious we think in the

6  redactions.  You can say there's a page here or there redacted.

7  It's a lengthy sentencing memo, so we're not talking about full

8  pages out of a five-page memo that were redacted.  There's a

9  large swath of material in here that's now public, and we

10  think, you know, we've hit the right balance in, you know,

11  making sure Mr. Armenta's safety is still taken into account

12  while making public what can be made public.

13        THE COURT:  Okay.  I've not gotten back,

14  Mr. Weinstein, to review redaction by redaction what category

15  of scrutiny or sensitivity should be ascribed to them, but can

16  you generally put on the record which of those categories you

17  relied on?

18        MR. WEINSTEIN:  Sure.

19        So with respect to both the district's ECF filing

20  rules and your Honor's individual rules, the nature of the

21  redactions are the two that your Honor mentioned earlier, which

22  are cooperation information and medical information or

23  treatment.  So there are redactions in here and not

24  insignificant with respect to medical information, both about

25  Mr. Armenta and, you know, others, third parties.

1      And then in the cooperation bucket, I think there's --

2  there's probably at least two types of information.  One is,

3  again, things he did proactively for the government, not

4  historical, that have not been made public.  And I think

5  certainly in Mr. Armenta's view, and I believe the government's

6  acknowledged it, with respect to individuals or potential

7  targets who -- you know, there is a security concern to even

8  disguise -- I don't want to go into it in more detail in court

9  because it just, you know, causes the issue.

10      So there's that kind of information, and then I would

11  say, secondly, certain aspects of the OneCoin investigation,

12  but very few, and really about specific steps that he took with

13  the government to try to further that investigation, I don't

14  want to get into details, but that have not been made public.

15      I think there's law enforcement concerns, which is

16  really the government's concern to raise, but law enforcement

17  concerns about the methods of investigating.  But also there

18  are security concerns, and I understand Mr. Lee says, well, if

19  people know you're a cooperator, that's it.  Well, I don't

20  think that's the right approach to whether or not there's a

21  security concern when you disclose certain information about

22  the steps you took on behalf of the government.

23      THE COURT:  Okay.  Mr. Lee, I'll give you an

24  opportunity to respond.

25      MR. LEE:  Sure.  Thanks a lot.

1      First, I want to be clear, I wasn't trying to be

2   cavalier in saying the horse is out of the barn.  I guess what

3   I meant is in a case of like take Konstantin -- just in this

4   case, once he testified -- see, this is sort of a unique

5   situation where it's sort of he didn't actually come forward

6   and testify in court, but I don't -- I mean, I guess I stand

7   behind the idea that once he became a cooperator, one would

8   assume that what he knew about OneCoin he would, you know, put

9   forward to the government.  So I don't know if it's the idea of

10  the extent of his cooperation.

11     I'm also not -- I mean, I think that the -- it's hard

12  to say at this distance that whatever he may have said during

13  his period of cooperation is a hot investigative piece that's

14  going to find her if she is alive given that so much time has

15  passed.  So I think that's a factor in this.

16     One thing -- and I have to say, as to the government's

17  memo, I didn't have a printer last night, so I didn't print it

18  out.  I was trying to scrap around and find it, but I think

19  there are much more minimal ones, and I'm going to go back and

20  look at them given what's been said here, but just in the

21  somewhat unredacted Armenta sentencing memo, there were

22  redactions about this check, however -- you know, Mr. Kawase's

23  check, section 8, page 42, two enormous footnotes are done, and

24  that's just offense conduct, unless there's something that I'm

25  missing here that on these other crimes that he's charged with.

1          And I think it's worth noting, it's unclear to me --

2    in most of these cases, we get to see the plea agreement so we

3    know what's been pled to, and it goes through in great

4    detail -- maybe it doesn't have a sentencing, you know, agreed

5    guideline, because it's sort of up to the judge under 5K1, but

6    here when you start redacting information about other crimes

7    that he'll be sentenced for and there's no way for the public

8    to know what those crimes were, and so to sort of assess, you

9    know, not to second guess, but to have --

10         THE COURT:  Aren't the actual crimes for which he is

11   going to be sentenced laid out in the government's letter?

12         MR. LEE:  I guess I'm saying I'd like to know -- and I

13   know I'm not supposed to speak to them, so I'll speak to you --

14   what the basis of this, the redactions about the other crimes

15   are, because in most, unless it's medical --

16         THE COURT:  Are you referring to Mr. Mead or

17   Mr. Weinstein?

18         MR. LEE:  I'm speaking about the Armenta memo.  I have

19   a copy of it, so I'm --

20         THE COURT:  Okay.

21         MR. LEE:  -- much more comfortable speaking about it.

22   But it seemed to me, when I started seeing redactions outside

23   of the cooperation section, a normal, quote, unquote, defendant

24   doesn't get to redact -- may redact medical information, no

25   problem, but this doesn't -- unless he somehow cooperated on

1    this check issue, I don't know the basis of the redaction.

2              So I guess it's difficult from the outside to argue

3    seeing all this.  I think -- I hope -- you know, we're saying

4    it's substantially unredacted, and all I know is that when I

5    saw it -- I was very hopeful, honestly.  Had it been what I

6    thought it was going to be, I would have written in and said

7    this is how the process is supposed to work.  We don't want to

8    know any medical information.  But when I'm getting a page

9    entirely redacted, it's just hard to believe this long after

10   the cooperation and with the fact that he's a cooperator so

11   public, the need for this.  And I think it undermines the

12   public transparency of the case and the sentencing, an

13   important sentencing in an important case.

14             THE COURT:  But you will allow, Mr. Lee, will you not,

15   that it is a 64-page memo?

16             MR. LEE:  Yes, most certainly.

17             THE COURT:  You are getting an awful lot of

18   information --

19             MR. LEE:  As we should.

20             THE COURT:  -- in the memo as redacted, both the

21   defense' and the government's, correct?

22             MR. LEE:  I don't know what the percentage is, and

23   admittedly I guess to save printing costs I've only gotten the

24   pages with the redactions on them, but, I mean, I read a lot of

25   sentencing memos and I don't know if -- I was also outraged at

1    the Jen Shah one.

2            THE COURT:  I'm sorry?  You were also --

3            MR. LEE:  There's a portion in a cover letter to this

4    which said that Inner City Press expressed the same outrage

5    about a recent sentencing by Judge Stein of Jen Shah, but it

6    was pretty bad that it got almost entirely unredacted in an

7    order by Judge Stein.  So I rarely see this.

8            THE COURT:  All right.

9            MR. LEE:  And as the judge, you may only see the

10   unredacted version, so you may not -- I'm not saying you're not

11   totally in control of your docket, but I understand that

12   percentage-wise there's a lot of -- I mean, I know more maybe

13   about the youth and the terrible conditions in the MDC, and

14   it's all very interesting, but I think the key to all this is

15   what are the crimes, what's the basis for the government coming

16   out with this recommendation given the open violation of the

17   cooperation agreement, and what was the plea agreement.

18           I mean, maybe it's just an oversight or maybe there's

19   something -- because normally, like Konstantin's is in --

20           THE COURT:  Right.

21           MR. LEE:   -- and in other cases the U.S. Attorney's

22   Office sends out plea agreements whenever they say there's a

23   proceeding of interest, and there's a change of plea

24   proceeding, they just send them out.  And this is one case

25   where it seems highly important to see it, and we don't have

1    it.  And I don't think we should take, at least as the press or

2    public, the defendant's version of what he pled to as the full

3    version.

4         So, I mean, I guess I don't want to -- full pages

5    redacted and information about crimes other than the OneCoin

6    robberies remain redacted.

7         THE COURT:  I guess I'm a little confused about what

8    you just said.  I mean, I assume -- you know the charges to

9    which Mr. Armenta plead guilty --

10        MR. LEE:  I --

11        THE COURT:  -- based on the government's submission at

12   least.

13        MR. LEE:  I'm not trying to say we don't know

14   anything.  All I'm saying is I've seen plea agreements.  I'll

15   give you, just for what it's worth, an example.  In one of the

16   Honduras drug kingpin cases where the plea agreement is like 18

17   pages long and it lists 83 murders -- this is a different case.

18   I understand.  But it's much more detailed than either of the

19   sentencing memos.

20        My understanding of a plea agreement is like you say

21   everything is in there, so it's like if you didn't disclose it,

22   you can still get hit with it later.  So I'm not saying that

23   these general categories of --

24        THE COURT:  Sure.

25        MR. LEE:  -- attempted extortion, the check, the

1  plane, aren't -- although, I don't know if some of that came

2  after the plea agreement, so --

3      THE COURT:  Yeah.  I guess -- and I have to admit I

4  haven't seen Mr. Armenta's cooperation agreement, so I don't

5  know how long it is, but I imagine that the length is driven by

6  the number of counts, which is why -- I assume why that

7  gentleman's plea agreement was 16 or 18 pages, because there

8  were -- you know, they had to lay out the counts, but I -- my

9  working assumption that it's otherwise boiler plate, you know,

10  boiler plate Southern District cooperation agreement in the way

11  that they tend to do, maddening to me as a defense lawyer back

12  in the day, but they tend to give everyone the same agreement.

13      MR. LEE:  Just for what it's worth, in this very

14  building -- well, actually, it might have even been, okay, your

15  trial of the diamond money laundering --

16      THE COURT:  Mr. Yokubov.

17      MR. LEE:  Yes.  One of the cooperators, when they

18  flashed the plea agreement on the screen, he had confessed to

19  25 DUIs, two fights.  Do you remember that?

20      I'm pretty sure that wasn't in the sentencing memo,

21  but it was in the plea agreement, because he divulged

22  everything.  I'm not saying I'm interested in that level of it,

23  but I think there is a divergence in that case between the plea

24  agreement of the cooperating witness who took the stand and

25  who's, well -- I'm sure he can say the same thing, that he's

N23DARMC

1    subject to danger and threats --

2              THE COURT:  Sure.

3              MR. LEE:  -- because he's a cooperator.

4              THE COURT:  Yes.

5              MR. LEE:  So I'm just saying there is some divergence

6    between what is in the plea agreement and what's in the

7    ultimate sentencing memo whenever that gentleman does it.

8              THE COURT:  Okay.  So here's what I think I need to

9    do.  I need to go through the redactions and Mr. Armenta's

10   submission, and determine, you know, whether or not they

11   reasonably fall under the traditional categories that we in

12   this building consider to be sensitive; and, if not, I'll go

13   back to Mr. Weinstein and Mr. Mead; and if I believe they are,

14   I will let you know just as soon as I know.  It will be in the

15   next couple of days.

16             MR. LEE:  Okay.  And, Judge, just one -- take a look

17   -- since I don't have it with me and I don't want to waive

18   anything, admittedly, the government's redactions are very few,

19   just take a look at them, and whatever you decide, I totally

20   trust you --

21             THE COURT:  Okay.  I have taken a look at the

22   government's redactions, and I think they're fine.

23             MR. LEE:  Yes.

24             THE COURT:  I have not studied Mr. Armenta's

25   redactions.  Okay?

1    MR. LEE:  Okay.

2    THE COURT:  Yes, Mr. Weinstein.

3    MR. WEINSTEIN:  Just while your Honor is reviewing

4  those, and because it was brought up, Mr. Lee referenced the

5  footnote on page 42 of our submission, which is in the context

6  of this chat that is detailed with what the conduct was.  Just

7  to the extent it's not clear in the footnote, the reason

8  there's a redaction is it is intertwined with his proactive

9  cooperation, and one subject of that cooperation for which

10  there are safety concerns.  And so the detail regarding those

11  individuals or -- you know, I'm not going to provide more

12  detail.  There is an issue there.

13    THE COURT:  Okay.

14    MR. WEINSTEIN:  That's why it is in the footnote, and

15  that's the only part of that conduct that's redacted.

16    THE COURT:  Very well.  Okay.  Anything else?

17    Mr. Mead?

18    MR. MEAD:  Nothing from the government, your Honor.

19    THE COURT:  Mr. Weinstein?

20    MR. WEINSTEIN:  No, your Honor.

21    THE COURT:  Mr. Lee?

22    MR. LEE:  Nothing at all.  Thanks for hearing me.

23    THE COURT:  Good to see you all, and I'll see you

24  Thursday.

25    (Adjourned)