

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

**MEMO ENDORSED**

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 4, 2024

> Defendant is directed to file his reply by April 15, 2024. SO ORDERED.
>
> *[signature]*
>
> Edgardo Ramos, U.S.D.J.
> Dated: 4/5/24
> New York, New York

**By ECF**
The Honorable Edgardo Ramos
Thurgood Marshall
United States Courthouse
40 Foley Street
New York, New York 10007

Re:   *United States v. Gilbert Armenta*, 17 Cr. 556 (ER)

Dear Judge Ramos:

The Government respectfully submits this motion in opposition to defendant Gilbert Armenta's motion for compassionate release. ECF 107 ("Mot." or "Motion"). The Government opposes the defendant's motion both because the defendant has failed to show extraordinary and compelling reasons for a reduction in sentence and because the factors under 18 U.S.C. § 3553(a) weigh against a reduction in his sentence.[1]

## I.   Background

The Government primarily relies on its recent sentencing memorandum, dkt. 71, for a description of the OneCoin scheme, the defendant's role in the scheme, his other criminal conduct, his cooperation, and his repeated breaches of his cooperation agreement. For ease of reference, an abbreviated version of those facts is set forth below.

### A.   Offense Conduct

#### 1.   Background on the OneCoin Scheme

Co-defendants Greenwood and Ruja Ignatova conceived of and orchestrated a multibillion-dollar fraud scheme by which they defrauded millions of individual OneCoin investors (the "OneCoin Fraud Scheme"). Greenwood and Ignatova co-founded OneCoin Ltd. ("OneCoin") in 2014. OneCoin was based in Sofia, Bulgaria. OneCoin marketed and sold a fraudulent cryptocurrency by the same name. Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.

---

[1] The Government respectfully requests that certain portions of this opposition be filed under seal because they discuss the defendant's medical history and/or ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇.

While Greenwood and Ignatova marketed OneCoin as a legitimate cryptocurrency like Bitcoin and deliberately drew the comparison between the two cryptocurrencies through their representations to investors and their marketing materials, OneCoin had no actual value and was conceived of by Greenwood and Ignatova as a fraud from day one.  The misrepresentations made by Greenwood and others to OneCoin investors were legion, and the cryptocurrency was worthless.  Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact OneCoin itself arbitrarily set the value of the coin without regard to market forces. The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019.  The purported price of OneCoins never decreased in value.

### 2. Armenta's Role in the OneCoin Scheme

Armenta acted as one of the primary money launderers for OneCoin.  Over the course of two years, between 2015 and 2017, Armenta laundered over $300 million of OneCoin proceeds through U.S. and international bank accounts.  To do it, Armenta repeatedly provided false information to banks and created fake documents to conceal the true origin of the funds.  He and his employees and associates claimed, among other things, that the transfers of OneCoin proceeds represented legitimate loans and investments—and in at least one case payment for a patent—and supplied fraudulent documentation to paper the transactions.  Armenta also introduced Ignatova to Mark Scott, who thereafter laundered another approximately $400 million in OneCoin proceeds.

Armenta's role was not limited to laundering fraud proceeds.  Armenta took other important steps to help Ignatova execute the underlying fraud scheme.  Among other things, he: (a) coordinated the opening of bank accounts for the purpose of receiving funds from OneCoin victims; (b) established and administered OneCoin "pool accounts" at various international banks, which were used to aggregate OneCoin victim funds; (c) introduced Ignatova to an online reputation company for the purpose of removing from the Internet negative information about OneCoin; and (d) used a bank that he acquired in the country of Georgia (the "Georgian Bank") to issue OneCoin-related payments, including recruitment commissions to OneCoin members who recruited new victims and refunds to dissatisfied OneCoin members.

Importantly, Armenta knew early on about the deception, victimization, and plight of OneCoin investors.  After OneCoin listed one of Armenta's bank accounts in Florida in wiring instructions for investor-victims, an online article appeared in December 2015 linking his office address to the scheme.  Shortly thereafter, disgruntled OneCoin investors appeared in person at the Florida office.  Armenta nonetheless continued laundering hundreds of millions of dollars in fraud proceeds.

Armenta's involvement in OneCoin funded his lavish lifestyle.  He purchased his own private jet (the "Private Jet") at a cost of over $3 million.  He bought a luxury oceanside property in Fort Lauderdale, Florida for $3.7 million ("Fort Lauderdale Property-1").  He wore designer clothing and luxury watches.  He rented luxury cars.

### 3. Additional Pre-Arrest Criminal Conduct

In 2016, Armenta transferred approximately $39 million in OneCoin fraud proceeds to fellow money launderer Christopher Hamilton, who subsequently stole $32 million of that money.

To get the money back, Armenta orchestrated an extortion scheme. He hired so-called "debt-collectors" in the U.K. and made clear that he was willing to authorize the use of force and threats of violence to collect payment from Hamilton. During one recorded meeting in August 2017, Armenta said that he had people watching Hamilton "every day," that he had pictures of Hamilton's daughter, wife, and Hamilton himself, and that Hamilton was "under surveillance." He went on to say, "So all we have to do is figure out where he is, etc., etc. Nobody will kill him, but they'll make him wish he was dead."

Approximately one week after that meeting, Hamilton made a police report to the South Wales Police. Two men, both unknown to him, visited Hamilton at his home and directed him to return the stolen funds. Following the meeting, Hamilton received a series of WhatsApp messages containing threats and surveillance photographs of Hamilton's wife and children. The messages urged Hamilton to return the $32 million in stolen funds or face serious consequences.

As part of his post-arrest proffers, Armenta disclosed to the Government other criminal conduct pre-dating the OneCoin scheme. First, in early 2014, Armenta made a payment of over $250,000 to an intermediary in Mexico, understanding that some or all of the funds would be paid to a government official. Armenta made the payment in an effort to secure a lucrative government contract. Until his arrest in September 2017, Armenta hoped to win the contract and move forward with related work sometime in 2018.

Second, between 2015 and 2017, using accounts at the Georgian Bank that he controlled, Armenta laundered a total of approximately $25-$30 million of illegal gambling payments. Specifically, he miscoded credit card transactions that involved illegal online gambling payments, in order to conceal the true underlying merchant and purpose of the payments. Miscoding was necessary to avoid illegal gambling payments being flagged or rejected by United States financial institutions. The miscoded transactions would appear to financial institutions to relate to innocuous (and in fact, non-existent) merchants. Armenta earned substantial fees for his role in laundering these funds.

### B. Procedural History and Breaches of Cooperation Agreement

In September 2017, Armenta was arrested on a sealed indictment. He quickly began cooperating, and ultimately pleaded guilty to a cooperation agreement in January 2018. Armenta subsequently provided extraordinary cooperation to the Government in its investigation of OneCoin.

However, Armenta also egregiously violated his cooperation agreement. In December 2018, after being explicitly told not to sell the Private Jet he had bought with OneCoin funds,

Armenta sold the jet for $2.2 million.  Armenta also lied to his counsel, and thereby to the Government, about the sale of the Private Jet.

The Government gave the defendant a second chance.  However, in April 2019, the defendant was involved in the unlawful negotiation of a $5 million U.S. Treasury refund check (the Check").  Armenta subsequently executed two transfers totaling $750,000 from the Check proceeds to his then-girlfriend, using fraudulent loan agreements to mask the true purpose of the transfers. ███████████████████████████████████████████████████████████████

As a result of these egregious and repeated breaches of his cooperation agreement, the Government determined that it could not call him at an upcoming trial, and it did not file a letter pursuant to U.S.S.G. § 5K1.1

The defendant's Guidelines at sentencing were 1,200 months.  Recognizing that the defendant should receive credit for his cooperation, the Government recommended a sentence of 60 months' imprisonment.  On February 16, 2023, this Court sentenced the defendant to a term of imprisonment of 60 months.

### C. The Defendant's Incarceration

The defendant has served approximately 19 months of his sentence.  Mot. At 5.  According to the Bureau of Prisons ("BOP") website, the defendant's current release date is October 29, 2026, meaning the BOP has calculated, when taking into account good time and other credits, the defendant to have approximately 31 months remaining on his sentence.

### D. The Defendant's Motion

On November 17, 2023, the defendant petitioned the BOP for a reduction of his term of imprisonment, primarily based on the risk of COVID-19.  The BOP has not yet responded to the defendant's petition, and the defendant filed this Motion on March 15, 2024.

## II. Applicable Law

Under 18 U.S.C. § 3582, as amended by the First Step Act, the court "may not modify a term of imprisonment once it has been imposed," except that:

> [T]he court, upon motion of the Director of the [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,

      whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

    "Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf." *United States v. Corbett*, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023). But in 2018, Congress enacted the First Step Act and "authorized courts to reduce a term of imprisonment upon motion by a defendant." *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

    The Sentencing Commission is responsible for "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Accordingly, even before the First Step Act was enacted, the Sentencing Commission promulgated a policy statement—Section 1B1.13 of the Guidelines—concerning sentence reductions under Section 3582, which explained, among other things, what constitutes an extraordinary and compelling reason for a sentence reduction.

    In September 2020, the Second Circuit held that this policy statement "applied only to a 'motion of the Director of the Bureau of Prisons,' *see* U.S.S.G. § 1B1.13 (historical note), and not 'to compassionate release motions brought by defendants[.]'" *Corbett*, 2023 WL 8073638, at *3 (quoting *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020)). As a result, the Second Circuit explained that the policy statement did not "constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." *Brooker*, 976 F.3d at 236. Even though Section 1B1.13 did not govern compassionate release motions filed by a defendant, district courts were nevertheless able to "look[ ] to § 1B1.13 for guidance in the exercise of [their] discretion" when considering such a motion. *United States v. Rodriguez*, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *3 (S.D.N.Y. Dec. 23, 2020).

    However, "[e]ffective November 1, 2023, . . . the Sentencing Commission amended the Guidelines to also cover defendant-initiated petitions." *Corbett*, 2023 WL 8073638, at *3 (citing U.S. Sent'g Commission, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023)). "The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated." *Id.*; *accord United States v. Horne*, 10 Cr. 954 (JPO), 2023 WL 8433980, at *1 (S.D.N.Y. Dec. 5, 2023) (same); *United States v. Ringgold*, No. CR ELH-17-232, 2023 WL 7410895, at *5-6 (D. Md. Nov. 8, 2023) (recognizing abrogation of the Fourth Circuit's equivalent of *Brooker* "because the Policy Statement is now expressly applicable to defendant-filed motions"). Section 1B1.13 of the Guidelines, as amended, explains what circumstances, "singly or in combination," constitute extraordinary and compelling reasons for release. *Id.*

In short, when a court considers a motion for compassionate release filed by a defendant, the court may only grant that motion where the defendant has demonstrated that (i) he has exhausted his administrative remedies, (ii) there are extraordinary and compelling reasons for a reduction of the sentence, (iii) the Section 3553(a) factors favor such a reduction, and (iv) such a reduction is consistent with the Sentencing Commission's policy statements. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant, as the proponent of the motion, bears the burden of proving that he is entitled to the requested relief under Section 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction.") (citing *Butler*); *United States v. Givens*, No. 14 Cr. 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (similar).

### III. Discussion

The defendant has failed to demonstrate extraordinary and compelling reasons for a reduction in sentence or that the Section 3553(a) factors weigh in favor of a sentence reduction.

#### A. The Defendant Has Not Shown Extraordinary and Compelling Reasons for Release

The defendant principally argues that his release is required for extraordinary and compelling reasons because of his ▮▮▮▮ and alleged lack of treatment for that disease. While ▮ is indeed a serious disease, it is also one whose severity varies, and potential treatments are limited. The defendant's case is not so serious as to constitute extraordinary and compelling circumstances, and he is being adequately treated by the BOP.

The defendant's updated BOP medical records are attached here as Exhibit A.[2] Those records show that the defendant received ▮▮▮▮ on March 20, 2024, a few days after the defendant filed the Motion. Ex. A at 68-71. The defendant was also seen by an outside ▮▮▮ on March 22, 2024. *Id.* at 1-2, 62-63. The ▮▮▮ ordered a number of lab tests for the defendant and scheduled a follow-up appointment within a month. *Id.* at 63. The ▮▮▮ further assigned ▮▮▮ for the defendant and said that he would be prescribed medication to treat his ▮ after the lab work was complete. *Id.* The defendant's treatment is now plainly moving forward.[3]

Moreover, it is not entirely clear what additional treatment the defendant should have been receiving. The defendant reported to the ▮▮▮▮▮▮

---

[2] The defendant's ▮ does not appear to have been severe at the time of his sentencing and when he began his incarceration on May 31, 2023. The defendant's 68-page sentencing memorandum filed on January 27, 2023, only briefly mentioned the disease, dkt. 64, and it was not mentioned at all at sentencing, dkt. 76. The defendant's administrative request for compassionate release on November 17, 2023, also only briefly mentioned his ▮. Dkt. 107-6 at 4.

[3] The Government does not understand that the Motion is what prompted the ▮ and appointment with a ▮▮▮.



A number of courts have denied compassionate release motions based on ▮ in similar circumstances. *See, e.g., United States v. McCrary*, No. CR 20-134, 2023 WL 6644589, at *3 (E.D. La. Oct. 12, 2023) (defendant had a number of health conditions, including ▮ but "none of these conditions, whether separately or in the aggregate, qualify as 'extraordinary and compelling' because they are manageable, even in the COVID-19 era, and there is no proof that she cannot care for herself"); *United States v. Loor*, No. 3:17-CR-225-TJC-MCR, 2022 WL 1224964, at *2 (M.D. Fla. Apr. 26, 2022) (defendant had ▮ and other health conditions, but "the medical records reflect that Defendant's conditions are well-monitored and treated. On the record before the Court, Defendant's conditions are not by themselves an 'extraordinary and compelling' circumstance."); *United States v. LeBlanc*, No. CR 17-139, 2022 WL 293246, at *4 (E.D. La. Feb. 1, 2022) ("LeBlanc has failed to demonstrate that extraordinary and compelling reasons exist for compassionate release based on her ▮ condition"); *United States v. Clark*, No. CR 111-070, 2021 WL 4942867, at *2 (S.D. Ga. Oct. 22, 2021) (no extraordinary and compelling circumstances when the defendant had ▮ and glaucoma).

### B. The Section 3553(a) Factors Require Denial of Compassionate Release

Even if the defendant had established "extraordinary and compelling" circumstances for release, the Court should still deny the Motion based on the sentencing factors set forth in 18 U.S.C. § 3553(a). The defendant was sentenced barely a year ago and has served less than half his sentence.

The crimes the defendant committed were of extreme gravity. He laundered over $300 million in OneCoin proceeds. His conduct was highly sophisticated, and took place over a period of years. The victims of the OneCoin fraud were millions of individual victims who had everything to lose. He committed his crimes out of greed, and he made vast amounts of money from them. He also had no qualms about resorting to extortion or threats of violence to collect on his debts. Releasing the defendant now would not adequately take into account the seriousness of the offense and the need for just punishment.

The Motion also argues that the defendant is no danger to the community. That is not so. The nature and timeline of the defendant's conduct in this case clearly illustrates the need for specific deterrence and protection of the public from further crimes by the defendant. Armenta's prosecution entirely failed to deter him from additional criminal conduct. Indeed, the arrest in this case did not deter him, but appears to have emboldened him to commit serious additional crimes— fraudulently negotiating a $5 million Treasury check, committing bank fraud to purchase a multi-million-dollar property,

In short, this Court's 60-month sentence was just, and the same factors present at sentencing in February 2023 remain present today. Accordingly, the Motion should be denied because any other result would be inconsistent with the Section 3553(a) factors.

## IV. Conclusion

For the foregoing reasons, the Government respectfully submits that this Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/
Kevin Mead
Nicholas Folly
Juliana Murray
Assistant United States Attorneys
(212) 637-2211

cc: Counsel of record (by ECF and email)